The **AMERICAN CIVIL LIBERTIES UNION OF GEORGIA, Gene Guerrero, Individually, and as Executive Director of the American Civil Liberties Union of Georgia, Eduard N. Loring, Robert W. Karnan, Juda H. Mintz, and Joseph C. Cavallo, Individually, Plaintiffs-Appellees,**

v.

The **RABUN COUNTY CHAMBER OF COMMERCE, INC., The Honorable Joe D. Tanner, Commissioner, Department of Natural Resources, State of Georgia, and The Honorable George D. Busbee, Governor, State of Georgia, Defendants-Appellants.**

No. 81–7356.

United States Court of Appeals, Eleventh Circuit.

Feb. 4, 1983.

Sutton & English, P.C., Frank Sutton, Clayton, Ga., and Ford, Harrison, Sullivan, Lowry & Sykes, G. Paris Sykes, Jr., Atlanta, Ga., for Rabun County.

Blake Craft, pro se.

John A. Pickens, Atlanta, Ga., for plaintiffs-appellees.

ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC.

(Opinion June 21, 1982, 11 Cir., 1982, 678 F.2d 1379)

Before KRAVITCH and JOHNSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

PER CURIAM:

The Order of this Court dated January 7, 1983, denying the Petition for Rehearing and Rehearing En Banc having been entered inadvertently without the modification of the original opinion, is hereby withdrawn and the following Order is substituted therefor:

Following petition for rehearing by the appellants, we have once again carefully read the transcript of evidence introduced in the trial court. As a result, we conclude that a more specific and detailed statement of the grounds upon which we base our conclusion that the plaintiffs had standing is needed. We therefore strike all of section II of our opinion and substitute a new section II in its place. For convenience, we republish the entire opinion containing the newly substituted section II dealing with standing:

This case presents important questions concerning the scope of the Establishment Clause of the First Amendment and the plaintiffs-appellees' ability to demonstrate Article III standing thereunder. The operative facts of this case are relatively simple. In 1979 the Rabun County Chamber of Commerce (Chamber), with initial approval

from the State of Georgia, erected an illuminated latin cross on a 85 foot structure in Black Rock Mountain State Park. The plaintiffs-appellees, the ACLU of Georgia and five individuals, brought suit in federal district court, seeking to enjoin the maintenance of the cross on public property. The district court, 510 F.Supp. 886, held that the plaintiffs-appellees had met the Article III requirements for standing and that the maintenance of the cross in the state park violated the Establishment Clause of the First Amendment, as applied to the states through the Fourteenth Amendment. We affirm for the reasons which follow.

## I. BACKGROUND

In 1956 a private corporation erected a large iron structure atop a rock outcropping on Black Rock Mountain, which is located in a state park in Rabun County, Georgia. This structure, when lighted, formed the shape of a Christmas tree. In 1957 the structure was altered by superimposing a second circuit of lights in the shape of a cross. The structure remained lighted, alternatively in the shape of a Christmas tree or a cross, for a number of years. Easter Sunrise Services, which had been held at this site prior to 1956, continued to be held at the base of the structure throughout this time period. Sometime between 1974 and 1976 the structure fell into a state of ill repair and was removed.

In early 1979, the Rabun County Chamber of Commerce approved a plan for the erection of a new cross on Black Rock Mountain to replace the old structure. Chamber representatives then discussed four possible sites for the cross with the Park Superintendent, an employee of the Georgia Department of Natural Resources. A small knoll located in the corner of the park between two camping areas was ultimately chosen as the site for the cross. From this location the cross, when illuminated, not only floods the two camping areas with light but is visible for several miles from the major highways which traverse the mountains.[1]

On March 5, 1979, the Executive Director of the Chamber wrote to the Georgia Department of Natural Resources (Department) seeking approval of the Chamber's project. The letter, which indicated that the Chamber would take full responsibility for the fund-raising of both the construction and maintenance costs, stated that the Chamber hoped to have the cross ready for dedication on Easter Sunday. By letter of March 19, 1979, the Department approved the Chamber's request for permission to erect the cross in the state park pending preparation of a license agreement.[2] Although never executed by the state, a revocable license was later prepared and sent to the Chamber.

In March and April of 1979, several press releases were issued by the Chamber. The March 19, 1979 release stated in part:

> The cross is a symbol of Christianity for millions of people in this great nation and the world.
>
> . . . . .
>
> There are now 33 days before Easter. Mayor Savage says "Wouldn't it be great if we could dedicate our cross on Easter morning—the most meaningful day for a cross."

The other press releases also discussed the plan to dedicate the cross at the 21st Annual Easter Sunrise Service. Although the construction of the cross was not completed by Easter morning, the district court found that it was dedicated at the Easter services.

Shortly thereafter, the Chamber and the Department received objections from the ACLU of Georgia to the placement of the cross on state property. At the Department's suggestion, a proposed resolution designating the cross as a memorial for deceased persons was drafted, although

---

1. The dimensions of the cross itself are approximately 26 feet by 35 feet. The cross contains thirty-one 175 watt mercury vapor lights. Prior to this suit the cross was illuminated for approximately 2½ to 4 hours nightly.

2. The Department's letter stated in part: "We wanted to formally notify you of our intention to approve your request in order that you might seek to meet your Easter deadline."

never passed.[3] After further correspondence between the Department and the Chamber, the Department, in June of 1979, ordered the Chamber to remove the cross from state property. The Chamber refused to remove the cross, however, and the state failed to take any affirmative action requiring it to do so.[4]

On November 2, 1979, the ACLU of Georgia and five individuals filed suit seeking to permanently enjoin the maintenance of the cross on public property as a violation of the Establishment Clause. Following a full evidentiary hearing on the merits, the district court held in favor of the plaintiffs-appellees and ordered the cross to be removed. After the Chamber filed its notice of appeal, the district court stayed its order of removal pending determination of the appeal by this Court. An injunction against the illumination of the cross, however, continues to remain in effect.

## II. STANDING

Few issues involving First Amendment analysis have engendered as much debate in recent years as the question of standing to bring an Establishment Clause claim. The difficulties of defining and applying the constitutional requirements and prudential considerations reflected by the case and controversy language of Article III have often been noted.[5] The concerns over whether a particular plaintiff has a personal stake in the outcome of a case are far from academic and indeed draw into consideration broader questions about the "proper —and properly limited—role of the courts in a democratic society." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975).[6] In the context of an Establishment Clause claim, the difficulties of applying principles of standing are enhanced by the reality that included among the various motivations for pursuing such a claim are the spiritual, value-laden beliefs of the plaintiffs.[7] Because of these inherent difficulties and in light of the special and sensitive treatment accorded First Amendment rights in general, courts and commentators alike have often placed Es-

---

**3.** The Department's suggestion concerning a memorial came soon after the ACLU of Georgia began investigating the cross. At least one court has held that a cross dedicated as a secular memorial for deceased veterans does not violate the Establishment Clause. *See Eugene Sand & Gravel Company v. City of Eugene,* 276 Or. 1007, 558 P.2d 338 (1976), *cert. denied,* 434 U.S. 876, 98 S.Ct. 226, 54 L.Ed.2d 155 (1977).

**4.** At trial, the State of Georgia, although no longer sanctioning the presence of the cross in a state park, opposed the entry of an injunction on the basis that the Establishment Clause had not been violated. We must assume that the State of Georgia continues to adhere to this position, as the state did not join in the appeal of this case.

**5.** *See, e.g., Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 471–76, 102 S.Ct. 752, 757–61, 70 L.Ed.2d 700 (1982); *Flast v. Cohen,* 392 U.S. 83, 94–101, 88 S.Ct. 1942, 1949–1953, 20 L.Ed.2d 947 (1968). *See generally* Davis, Standing, 1976, 72 Nw.L.Rev. 69, 69–70 (1977); Parker & Stone, Standing and Public Law Remedies, 76 Colum.L.Rev. 771, 773–76 (1978).

**6.** *See, e.g., United States v. Richardson,* 418 U.S. 166, 179, 94 S.Ct. 2940, 2947, 41 L.Ed.2d 678 (1974) (absence of standing "gives support to the argument that the subject matter is committed to the surveillance of Congress, and ultimately to the political process); *Flast v. Cohen, supra,* 392 U.S. at 95, 88 S.Ct. at 1949 (standing is an aspect of justiciability which is the "term of art employed to give expression to [the] dual limitation placed upon federal courts by the case-and-controversy doctrine); *see generally,* L. Tribe, American Constitutional Law 52–56, 79–80 (1978).

**7.** In noting the distinction between motivating principles and injury for Article III purposes, Professor Davis has stated:

The basic idea that comes out in numerous cases is that an identifiable trifle is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation.

Davis, Standing: Taxpayers and Others, 35 U.Chi.L.Rev. 601, 613 (1968). This "identifiable trifle" has been appropriately described as the "thin but durable thread" tying recent public interest cases to the Marbury Model of judicial review, which limits the power of the judiciary to cases involving the rights of individuals. Sager, Insular Majorities Unabated, 91 Harv.L.Rev. 1373, 1379–80 (1978); *see generally,* Albert, Justiciability and Theories of Judicial Review: A Remote Relationship, 50 S.Calif.L. Rev. 1139, 1149 (1977).

tablishment Clause cases in a separate category of standing concerns.[8] Recently, however, in *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), the Supreme Court has clarified this area of the law by retreating from a more specialized approach towards citizen standing under the Establishment Clause. Thus, in *Valley Forge*, the Supreme Court stated that there is no "sliding scale" of standing, *id.* at 484, 102 S.Ct. at 765, and that neither a mere spiritual stake in the outcome nor an intense commitment to separation of church and state is a "permissible substitute for a showing of injury itself." *Id.* at 486, 102 S.Ct. at 766. Moreover, the Court expressly held that the mere "psychological consequence presumably produced by observation of conduct with which one disagrees" is not a cognizable injury. *Id.*

Relying primarily upon the *Valley Forge* decision, the appellant in this case asserts that we must reverse the district court's judgment for the plaintiffs-appellees on the basis that they had no standing to initiate the suit. The district court, in an opinion issued prior to the decision in *Valley Forge*, held that the plaintiffs had standing based on their "spiritual stake in First Amendment values." 510 F.Supp. at 890 (*quoting Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 154, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970)). While we agree with the appellant that the district court's rationale is inconsistent with the teachings of *Valley Forge*, we believe that the plaintiffs-appellees have demonstrated a cognizable injury in fact sufficient to invoke the jurisdiction of this Court.

The plaintiffs in the instant case include the ACLU of Georgia and five individuals. The ACLU of Georgia is a nonprofit organization committed to the preservation of individual constitutional liberties, especially those emanating from the First Amendment. The five individual plaintiffs have been residents of the State of Georgia for many years. One of these individuals, plaintiff Guerrero, appears both as a member of the ACLU of Georgia and in his personal capacity. Although the plaintiffs, and indeed the district court, originally relied solely on their status as separationists to establish standing, evidence of noneconomic injury was also presented at trial. In essence, plaintiffs allege that they have been injured in fact because they have been deprived of their beneficial right of use and enjoyment of a state park. The cross is situated on public land to which all residents of Georgia have a right of access. Substantial evidence supports the district court's finding that the latin cross is a universally recognized symbol of Christianity. Moreover, the record contains the uncontroverted testimony of a witness that the cross, when illuminated, floods two of the campgrounds with a light almost bright enough to enable one to read at night. Other witnesses testified to the religious aura created in the camping area by the illuminated cross. Plaintiff Guerrero testified that the ACLU received complaints about the cross. Each of the individual plaintiffs testified unequivocally at trial that they would not use Black Rock Mountain State Park so long as the cross remained there. More particularly, two of the individual plaintiffs testified that they were campers. Prior to this litigation, plaintiff Karnan had camped at Red Top Mountain State Park, a state park in Geor-

---

8. *See, e.g., Flast v. Cohen*, 392 U.S. 83, 114, 88 S.Ct. 1942, 1959, 20 L.Ed.2d 947 (1968) (Stewart, J., concurring) (Establishment Clause creates a personal constitutional right); *Anderson v. Salt Lake City Corp.*, 475 F.2d 29, 31 (10th Cir.1973), *cert. denied*, 414 U.S. 879, 94 S.Ct. 50, 38 L.Ed.2d 124 (1973) (injury to religious beliefs or values is a type of non-economic injury); *see generally* cases collected in *O'Hair v. White*, 675 F.2d 680 at 687–688 n. 18 (5th Cir.1982) (en banc); Albert, Justiciability and

Theories of Judicial Review: A Remote Relationship, *supra* note 7 at 1151 (court has relaxed personal injury requirement to allow intangible, perhaps ideological, injury in cases involving separation of church and state).

9. Plaintiff Karnan, a Unitarian minister, also testified that he regularly travels on U.S. Highway 441 to his church's conference center in Highlands, North Carolina. Karnan stated that the cross is clearly visible at night from both the highway and the conference center.

gia, and at federal parkland near the Black Rock Mountain State Park in northern Georgia. Plaintiff Guerrero testified that he is a regular camper and camps approximately three to four times each year. Plaintiffs Guerrero and Karnan further testified that they would not camp in Black Rock Mountain State Park because of the cross.

■ It is well established that in order to satisfy the "case or controversy" requirement of Article III, a plaintiff must demonstrate that he personally has been subjected to an "actual or threatened injury," *Gladstone, Realtors v. City of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979), and that there exists "a 'fairly traceable' causal connection between the claimed injury and the challenged conduct." *Duke Power Co. v. Carolina·Environmental Study Group, Inc.,* 438 U.S. 59, 72, 98 S.Ct. 2620, 2629, 57 L.Ed.2d 595 (1978) (*quoting Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977)).[10] In its interpretation of the "injury in fact" requirement, the Supreme Court has repeatedly emphasized that a showing of noneconomic injury is sufficient to confer standing. *See, e.g., Valley Forge Christian College v. Americans United For Separation of Church and State, supra* 454 U.S. at 486, 102 S.Ct. at 766; *United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Duke Power Co. v. Carolina Environmental Group, Inc., supra* 438 U.S. at 73–74, 98 S.Ct. at 2630–2631; *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636

(1972); *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

Several of the Supreme Court's decisions on noneconomic injury involve factual situations similar to that presented in the instant case. Indeed, the underpinnings of plaintiffs' claim of noneconomic injury based on deprivation of their right to the use of public land may be found in the Supreme Court's implicit holding in *Sierra Club v. Morton, supra.* In that case, the Sierra Club, a nonprofit organization committed to conservation of national parks, challenged the federal government's approval of a skiing development in Sequoia National Forest. Although rejecting plaintiff's theory of standing based on its status as a "representative of the public," the Supreme Court indicated that if the plaintiff had alleged that individual members' use of the park would be affected by this action, the requirements for standing would have been satisfied.[11] *Id.* 405 U.S. at 735–36 n. 8, 92 S.Ct. at 1366–1367 n. 8, *compare Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Moreover, in *United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), the Supreme Court found that the plaintiffs had alleged precisely the type of specific injury to individuals which was lacking in the *Sierra Club* decision. *Id.* at 687–88, 93 S.Ct. at 2415–2416. In *SCRAP* several residents of Washington, D.C. challenged a proposed railroad freight hike which they alleged would discourage the use of recycleable materials, increase the use of raw materials and therefore damage

---

**10.** The causal connection requirement is not seriously in issue in this case. To the extent that the plaintiffs have suffered an injury resulting from the presence of the cross, their injury is "likely to be redressed" by a decision requiring the removal of the cross. *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976).

Similarly, none of the prudential considerations which have been identified by the court is applicable to this case. *See, e.g., Valley Forge Christian College v. Americans United for Separation of Church and State, supra,* 454 U.S. at 474–75, 102 S.Ct. at 759–60. Thus, the plaintiffs do not attempt to assert the rights of third

parties or raise abstract issues more appropriately resolved by the representative branches. *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). And, it is apparent that the plaintiffs' complaint falls within "the zone of interests to be protected ... by the ... constitutional guarantee in question." *Association of Data Processing Services Orgs. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970).

**11.** Indeed upon remand the plaintiff adopted the Supreme Court's suggestion and amended its complaint to state individualized injury to its members. *See Sierra Club v. Morton,* 348 F.Supp. 219 (N.D.Calif.1972).

the national parks in the Washington area which were used by plaintiffs for camping, hiking, sightseeing and fishing. In concluding that the requirements of standing had been satisfied, the Court found that the plaintiffs had alleged a "specific and perceptible harm that distinguished them from other citizens who had not used the natural resources that were claimed to be affected." *Id.* at 689, 93 S.Ct. at 2416 (footnote omitted). More recently, in *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978), the Court extended standing to an environmental organization and several individuals residing near nuclear power plants to challenge the constitutionality of the Price Anderson Act under the Due Process Clause of the Fifth Amendment. In concluding that the plaintiffs had alleged sufficient injury in fact, the Court relied in part on the claimed "environmental and aesthetic consequences of the thermal pollution of the two lakes in the vicinity of the disputed power plants." *Id.* at 73–74, 98 S.Ct. at 2630–2631. Rejecting the argument that plaintiffs should be required to demonstrate a connection between the injuries claimed and the constitutional rights asserted, the Court in *Duke Power* also made it clear that, outside the context of taxpayer standing cases, a noneconomic injury was sufficient to confer standing to assert any type of constitutional right. *Id.* at 78–79, 98 S.Ct. at 2633–2634.

Each of these cases supports the view that, in the context of environmental concerns, an effect on an individual's use and enjoyment of public land is a sufficient noneconomic injury to confer standing to challenge governmental actions.[12] This specific type of noneconomic injury has also been recognized in the context of an Establishment Clause case. In *Allen v. Hickel,* 424 F.2d 944 (D.C.Cir.1970) the Court of Appeals for the District of Columbia Circuit held that the plaintiffs, residents of the District of Columbia, had standing to challenge the placement of an illuminated life size nativity scene in Ellipse, a national park located across the street from the White House.[13] While noting that all citizens of the United States had the right to use and enjoy public parklands, the Court relied at least in part on the plaintiffs' individual burden with respect to their use of the park:

> The standing issue was perhaps clarified, in terms of perspective, when Government counsel put it at argument that if the plaintiffs didn't like to look at the crèche, they could avoid walking near the Ellipse while it was occupied by the crèche. Plaintiffs were entitled, as members of the public, to enjoy the park land and its devotion to permissible public use; a government action cannot infringe that right or require them to give it up without access to the court to complain that the action is unconstitutional.

*Id.* at 947 (footnotes omitted).

Thus, at least prior to the *Valley Forge* decision, it seemed clear that one who demonstrated that his use of public lands was or would be affected by the particular challenged action had stated a sufficient noneconomic injury to confer standing. We must next determine whether this type of noneconomic injury can provide a basis for standing to initiate an Establishment

---

**12.** We note that the claims in *Sierra Club, SCRAP,* and *Duke Power* cases were based on either the Administrative Procedure Act, 5 U.S.C. § 702 (1976) or other acts of Congress. This fact does not, however, alter our analysis since: "[n]either the [APA] nor any other congressional enactment, can lower the threshold requirements of standing under Art. III." *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 487 n. 24, 102 S.Ct. 752, 766 n. 24, 70 L.Ed.2d 700 (1982), *see United States v. SCRAP,* 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2416 n. 14, 37 L.Ed.2d 254 (1973); *O'Hair v. White,* 675 F.2d 680 at 687 n. 16 (5th Cir.1982) (en banc).

**13.** *Compare Citizens Concerned for Separation of Church and State v. City of Denver,* 628 F.2d 1289 (10th Cir.1980), *cert. denied,* 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 975 (1981). In that case, the Court held that an unincorporated association lacked standing to challenge the maintenance of a nativity scene on public land because the association had failed to identify a single person as a member of its organization.

Clause claim under the Supreme Court's analysis in *Valley Forge.*

In *Valley Forge,* the plaintiffs, a nonprofit organization and four of its employees, brought suit to enjoin the transfer of surplus federal property to an educational institution affiliated with a religious order known as the Assemblies of God. After determining that the plaintiffs were unable to satisfy the criteria necessary to establish standing to sue as taxpayers, *id.* 454 U.S. at 476–82, 102 S.Ct. at 761–63,[14] the Court addressed the issue of "citizen standing." The lower court's holding that the plaintiffs had satisfied the requirements of Article III standing was based in part on the theory that the "challenged governmental action caused 'injury in fact' to [the plaintiffs'] shared individuated right to a government that 'shall make no law respecting the establishment of religion.' " *Americans United for Separation of Church and State, Inc. v. United States Department of Health, Education and Welfare,* 619 F.2d 252, 261 (3d Cir.1980). In rejecting this theory, the Supreme Court held that the plaintiffs' status as separationists alone was, in no significant respect, distinguishable from the "generalized interest of all citizens in constitutional governance." 454 U.S. at 483, 102 S.Ct. at 764 (*quoting Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 217, 94 S.Ct. 2925, 2930, 41 L.Ed.2d 706 (1974)). Noting that such "generalized grievances" have consistently been found insufficient to confer standing to assert violations of other constitutional provisions,[15] the Court found that there was no principled basis for affording standing to one who asserted merely a violation of the Establishment Clause. In concluding that the plaintiffs failed to allege any cognizable injury in fact, the Court stated:

Although they claim that the Constitution has been violated, they claim nothing else. They fail to identify any personal injury suffered by the plaintiffs *as a consequence* of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees. This is not an injury sufficient to confer standing under Art. III, even though it is phrased in constitutional terms.

*Id.,* 454 U.S. at 485, 102 S.Ct. at 765 (emphasis in original). Moreover, the Court held that the intensity of the plaintiffs' interest in the separation of church and state could not substitute for a showing of injury in fact. *Id.*

As we have noted previously, the Court, in finding that the plaintiffs in *Valley Forge* had not alleged an injury of any kind, reaffirmed its prior holdings that noneconomic injury could serve as a basis for standing. Moreover, in distinguishing *Valley Forge* from other Establishment Clause cases where standing to sue was found to exist, the Court provided us with specific examples of the type of noneconomic injury which would overcome the deficiencies of *Valley Forge.* Thus, the Court specifically reaffirmed its holding in *School District of Abington Township v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), where school children and their parents were found to have standing to contest a law requiring Bible reading in public schools. The plaintiffs in *Valley Forge* had relied upon the Court's statement in *Data Processing, supra* 397 U.S. at 154, 90 S.Ct. at 830, that:

A person or family may have a spiritual stake in First Amendment values sufficient to give standing to raise issues concerning the Establishment Clause and the Free Exercise Clause. *Abington School District v. Schempp,* 374 U.S. 203 [83 S.Ct. 1560, 10 L.Ed.2d 844].

---

14. No expenditures have been made by the State of Georgia in connection with the cross except for the costs incurred in maintaining the park itself. The appellees in this case do not rely upon the principles of "taxpayer standing" set forth in *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1967) and its progeny.

15. *See, e.g., Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974) (Accounts Clause, U.S. Const., Art. I, § 9, cl. 7); *United States v. Richardson,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974) (Incompatibility Clause, U.S. Const., Art. I, § 6, cl. 2).

The Court in *Valley Forge* held that this language could not be construed to authorize standing for any person asserting a violation of the Establishment Clause, but must be read in the context of the facts of the *Abington* decision. Unlike the plaintiffs in *Valley Forge,* the plaintiffs in *Abington* had demonstrated an injury in fact because they "were forced to assume special burdens" to avoid "unwelcome religious exercises." 454 U.S. at 487 n. 22, 102 S.Ct. at 766 n. 22. Thus, the Court concluded that the *Abington* decision was clearly distinguishable from the situation presented by the plaintiffs in *Valley Forge.*[16]

The Chamber asserts that the instant case is more like the *Valley Forge* than the *Abington* decision and points to several common characteristics of the plaintiffs in these cases. Thus, the Chamber relies on the statements by the Court that none of the plaintiffs in *Valley Forge* resided within the state where the property to be transferred (a closed hospital) was located, that all of the plaintiffs had learned of the transfer through a news release, and that an alleged violation of the Establishment Clause "does not provide a special license to roam the country in search of governmental wrongdoing ...." 454 U.S. at 487, 102 S.Ct. at 766. Although conceding that in this case the plaintiffs are residents of Georgia, the Chamber notes that each of the plaintiffs resides in Atlanta, which is more than 100 miles from the state park. Moreover, only plaintiff Karnan had actually seen the cross prior to the time the suit was filed and that sighting was from an airplane. Finally, the other plaintiffs derived their information about the cross from anonymous phone calls and news releases.

We do not find the existence of these similarities to be crucial when the Court's statement in *Valley Forge* are read in the context of the entire opinion.[17] In describing the plaintiffs in *Valley Forge,* the Court highlighted the total lack of connection between the plaintiffs and the subject matter of the action. By contrast, the plaintiffs in this case are residents of Georgia who make use of public parks which are maintained by the State of Georgia; these factors thus provide the necessary connection, which was missing in *Valley Forge,* between the plaintiffs and the subject matter of the action.

A comparison of the theory of noneconomic injury presented in the instant case with the factual situations involved in the *Valley Forge* and *Abington* decision logically permits only one conclusion. Although the underlying motivations of the plaintiffs

---

**16.** In explaining this distinction, the Court also compared its decision in *Abington* with its earlier decision in *Doremus v. Board of Education,* 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952). Although the substantive issues raised in *Doremus* were identical to those in *Abington,* the *Doremus* appeal was "dismissed upon the graduation of the school child involved and because of the appellants' failure to establish standing as taxpayers." 454 U.S. at 487 n. 22, 102 S.Ct. at 766 n. 22 (*quoting School District of Abington Township v. Schempp, supra,* 374 U.S. at 224 n. 9, 83 S.Ct. at 1572 n. 9 (1963)). In addition, although the question of standing was not specifically addressed, the Court recently reached the merits of an Establishment Clause case raising issues similar to those involved in *Abington. See Stone v. Graham,* 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980).

**17.** Several considerations support this conclusion. First, to the extent that the Chamber is asserting that the relevant factor is the distance between the plaintiffs and the park, we reject this argument. While close proximity may be of controlling significance in some cases, such a requirement in this case would be inconsistent with the function of a state park in providing recreational facilities for state vacationers, regardless of the distance between the park and their residence. Similarly, we can conceive of no rational basis for requiring the plaintiffs to view in person the subject matter of the action prior to filing the suit. Each plaintiff found his option to use the Georgia state public parklands restricted, upon learning of the cross, just as each parent in *Abington* found his or her right to participate in the public school system jeopardized, even without actually seeing teachers reading the Bible to school children. Nor were the plaintiffs in *United States v. SCRAP, supra,* required to view discarded refuse in order to appreciate its effect on their use of national parks. Even if the Court in *Valley Forge* intended for this factor to be controlling, we note that, at the least, one of the plaintiffs in this case viewed the cross prior to the filing of the suit.

in all three cases can be described as either a spiritual belief or a commitment to separation of church and state, the plaintiffs in the instant case have demonstrated an individualized injury, other than a mere psychological reaction, which they have suffered "as a consequence" of the challenged action. Plaintiffs Karnan and Guerrero are residents of Georgia, who have the right to use the state parks for camping purposes.[18] They have demonstrated the effect that the presence of the cross has on their right to the use of Black Rock Mountain State Park both by testifying as to their unwillingness to camp in the park because of the cross and by the evidence of the physical and metaphysical impact of the cross. In explaining why the plaintiffs in *Abington* had demonstrated a sufficient injury in fact, the Supreme Court in *Valley Forge* specifically emphasized the dilemma facing the plaintiffs: the schoolchildren were "subjected to unwelcome religious exercise or were forced to assume special burdens to avoid them." 454 U.S. at 487 n. 22, 102 S.Ct. at 766 n. 22. No less can be said of the plaintiffs in the instant case. Plaintiffs Guerrero and Karnan are presently forced to locate other camping areas or to have their right to use Black Rock Mountain State Park conditioned upon the acceptance of unwanted religious symbolism. In addition, because the cross is clearly visible from the porch of his summer cabin at the religious camp which he directs as well as from the roadway he must use to reach the camp, plaintiff Karnan has little choice but to continually view the cross and suffer from the spiritual harm to which he testified. Karnan's injury is particularly disturbing and intrusive because it manifests itself at his special place of religious contemplation and retreat.

In sum, we are unable to find any qualitative differences between the injury suffered by the plaintiffs in this case and that which the Court found in *Abington*. Furthermore, although the degree of injury to the children in *Abington* may be greater than that suffered by the campers in the instant case, the Supreme Court has made it clear that no minimum quantitative limit is required to establish injury under either a constitutional or prudential analysis:

"Injury in fact" ... serves to distinguish a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem. We have allowed important interests to be vindicated by plaintiffs with no more at stake ... than a fraction of a vote, see *Baker v. Carr*, 389 U.S. 186 [82 S.Ct. 691, 7 L.Ed.2d 663], a $5 fine and costs, see *McGowan v. Maryland*, 366 U.S. 420 [81 S.Ct. 1101, 6 L.Ed.2d 393], and a $1.50 poll tax, *Harper v. Virginia Bd. of Education*, 383 U.S. 663 [86 S.Ct. 1079, 16 L.Ed.2d 169].

*United States v. SCRAP*, 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2416 n. 14, 37 L.Ed.2d 254 (1973). Thus, we find that plaintiffs Guerrero and Karnan have sufficiently demonstrated particular and personalized noneconomic injury to distinguish them from the general citizenry who may be as equally offended on a philosophical basis but who are not as specifically or perceptibly harmed, consistent with both the prior precedent defining noneconomic injuries in general and the decision in *Valley Forge*, to provide them with a "personal stake in the controversy." *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Because we have determined that at least these two individuals have met the requirements of Article III, it is unnecessary for us to con-

---

**18.** Although plaintiffs Karnan and Guerrero have used parklands for camping purposes, appellant points out that neither of them has actually camped in Black Rock Mountain State Park. In determining the significance of this fact, however, it must be remembered that a cross has been lighted in Black Rock Mountain State Park almost continually since 1957. Plaintiffs Karnan and Guerrero have testified unequivocally that they would not camp in the park because of the presence of the cross. It would be anomalous to require these plaintiffs either to compromise their principles by subjecting themselves to the religious symbolism of the cross or to demonstrate that they used the park prior to the erection of the cross more than twenty-five years ago. The "case and controversy" requirements of Article III cannot be reduced to such mere technicalities.

sider the standing of the other plaintiffs in this action. *See, e.g., Watt v. Energy Action Education Foundation,* 454 U.S. 151, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981); *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1978).

## III. ESTABLISHMENT CLAUSE

■■■ The Establishment Clause of the First Amendment prohibits Congress from making any law "respecting the establishment of religion .... " U.S. Const., Amend. I. This prohibition is applicable to the states through the Fourteenth Amendment.[19] *See, e.g., Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947); *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). In interpreting the Establishment Clause, the Supreme Court has identified three tests to be applied to the challenged actions of a state:

(1) Whether the action has a secular purpose;

(2) Whether the "principal or primary effect" is one which neither "advances nor inhibits religion;" and

(3) Whether the action fosters " 'an excessive government entanglement with religion.' *Walz [v. Tax Commissioners,* 397 U.S. 664, 674 [90 S.Ct. 1409, 1414, 25 L.Ed.2d 697] (1970) ].''

*Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111–12, 29 L.Ed.2d 745 (1971) (citations omitted). Moreover, it is clear that if even one of these three principles is violated, the challenged governmental action will be found to violate the Establishment Clause. *See, e.g., Stone v. Graham,* 449 U.S. 39, 40–41, 101 S.Ct. 192, 193–194, 66 L.Ed.2d 199 (1980); *accord Committee for Public Education & Religious Liberty v. Nyquist,* 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973).

In the instant case, the district court concluded that the erection of the cross in Black Rock Mountain State Park violated each of the three principles announced in *Lemon v. Kurtzman, supra.* Although both parties agree that the district court applied the correct legal standard,[20] the Chamber asserts that the district court's decision is erroneous. More specifically, the Chamber asserts that the district court erred in finding that the cross was erected with a religious purpose rather than the Chamber's alleged secular purpose of promoting tourism. Similarly, the Chamber challenges the district court's finding that the primary effect of the cross was to advance Christiani-

---

**19.** At the outset, the Chamber asserts that the appellees cannot maintain their claim under the Establishment Clause because they have failed to demonstrate the existence of state action. We find this contention to be wholly without merit. The cross is located on state property. The state, acting through its Department of Natural Resources, initially approved the Chamber's project and later failed to require the Chamber to remove the cross. Under the now familiar principles of state action, the state's involvement with the cross is clearly sufficient to bring this case within the prohibitive scope of the First and Fourteenth Amendments. *E.g., Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) (state failed to require a private restaurant, located in a state owned parking garage, to operate in a racially non-discriminatory manner); *Wimbush v. Pinellas County,* 342 F.2d 804 (5th Cir.1965) (leasee of county owned property must comply with requirements of equal protection clause).

**20.** In a recent decision, the Supreme Court has stated that the *Lemon* test is applicable only to Establishment Clause cases involving governmental benefit to all religions. *See Larson v. Valente,* 456 U.S. 228, 251, 102 S.Ct. 1673, 1687, 72 L.Ed.2d 33 (1982). Conversely, where the challenged action involves alleged discriminatory treatment of various religions by a government, the court has applied a "strict scrutiny/compelling governmental interest" standard similar to that which prevails under equal protection analysis. *Id.* 456 at 246–47, 102 S.Ct. at 1684–85. *See Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). In the instant case, no evidence has been presented concerning the state's refusal to approve construction of symbolic expressions of religions other than Christianity in state parklands. In the absence of any evidence of an "express design [to] burden or favor selected religious denominations" we conclude that the *Lemon* test remains the controlling legal standard in this case. 456 U.S. 228, 255, 102 S.Ct. 1673, 1688, 72 L.Ed.2d 33.

ty and that the presence of the cross created a potential for political divisiveness.

■■■ At the core of the Establishment Clause is the requirement that a government justify in secular terms its purpose for engaging in activities which may appear to endorse the beliefs of a particular religion. Although courts have rarely looked behind the stated legislative purposes,[21] it is clear that an avowed secular purpose, if found to be self serving, may "not be sufficient to avoid conflict with the First Amendment." *Stone v. Graham, supra* 449 U.S. at 41, 101 S.Ct. at 194; *cf. Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) (no secular purpose attributed to state's ban on the teaching of evolution in public schools). When a government permits religious symbols to be constructed on public property,[22] its ability to articulate a secular purpose becomes the crucial focus under the Establishment Clause. *See, e.g., Stone v. Graham, supra* (posting of Ten Command-

ments in public school found to have a religious purpose).[23]

■■■ In the instant case, the district court specifically found that the cross was erected "out of religious stirrings and for a religious purpose." In reviewing this decision on appeal, we note that findings of fact made by a district court can only be set aside if they are determined to be clearly erroneous. Fed.Rule Civ.Proc. 52(a). As the Supreme Court has recently reiterated, Rule 52(a) must be applied to both subsidiary and ultimate facts. *See Pullman-Standard v. Swint,* 456 U.S. 273, 285, 102 S.Ct. 1781, 1788, 72 L.Ed.2d 66 (1982) (intentional discrimination as used in § 703(h) of Title VII is a question of ultimate fact to which Rule 52(a) must be applied).[24] The district court's finding of religious purpose in this case is supported by ample evidence in the record. Numerous qualified witnesses testified at trial that the latin cross is universally regarded as a symbol of Chris-

21. *See, e.g., Lemon v. Kurtzman,* 403 U.S. 602, 613, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); *Gillette v. United States,* 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971); *see generally* L. Tribe, American Constitutional Law 835–39 (1978).

22. As the Supreme Court has noted the source, whether public or private, of the funds used to construct or maintain these symbols is not decisive; rather the focus of the Establishment Clause is on the state's support of a particular activity. *See, e.g., Stone v. Graham,* 449 U.S. 39, 42, 101 S.Ct. 192, 194, 66 L.Ed.2d 199 (1980); *Engel v. Vitale,* 370 U.S. 421, 431, 82 S.Ct. 1261, 1267, 8 L.Ed.2d 601 (1962).

23. Other courts addressing Establishment Clause challenges to the maintenance of religious symbols on public property have based their decisions primarily on the finding of a religious purpose. *See, e.g., Gilfillan v. City of Philadelphia,* 637 F.2d 924 (3d Cir.1980), *cert. denied,* 451 U.S. 987, 101 S.Ct. 2322, 68 L.Ed.2d 845 (1981) (city's design and construction of platform, including large latin cross, for papal visit found to have religious purpose); *Citizens Concerned for Separation of Church and State v. Denver,* 481 F.Supp. 522 (D.C.Colo.1979), *rev'd on other grounds,* 628 F.2d 1289 (10th Cir.1981) (nativity scene on county property erected with religious purposes); *Fox v. City of Los Angeles,* 22 Cal.3d 792, 150 Cal.Rptr. 867, 587 P.2d 663 (1978) (lighted cross on city hall found to have religious purpose); *but see Eugene Sand and Gravel Company v. City of Eu-*

gene, 276 Or. 1007, 558 P.2d 338 (1976), *cert. denied,* 434 U.S. 876, 98 S.Ct. 226, 54 L.Ed.2d 155 (1977) (cross erected as veteran's war memorial had secular purpose); *Meyer v. Oklahoma,* 496 P.2d 789 (1972) (cross erected in distinctly secular environment, fairground, upheld under Oklahoma Constitution); *Paul v. Dade County,* 202 So.2d 833 (Fla.App.1967), *cert. denied,* 390 U.S. 1041, 88 S.Ct. 1636, 20 L.Ed.2d 304 (1968) (cross on courthouse lighted during Christmas season found to have secular purpose as yule season decoration). While the correctness of the decision approving these secular purposes is questionable, *see* text at 1110–1111 *infra,* we find it unnecessary to discuss these cases as they are all clearly distinguishable from the facts of the instant case.

24. The Chamber argues that Rule 52(a) should not be applied to this case because the district court totally disregarded uncontradicted evidence without any basis for doing so. For example, the Chamber asserts that the district court ignored testimony that the Easter deadline was chosen merely because Easter was the next holiday after the decision to erect the cross. We note, however, that the record also contains statements made by members of the Chamber to the effect that Easter is the most meaningful day for the dedication of a cross. After carefully reviewing each of the Chamber's other allegations of uncontradicted evidence, we find no basis for questioning the factual findings made by the district court.

tianity. Moreover, the selection of an Easter deadline for completion of the cross, the decision to dedicate the cross at Easter Sunrise Services, and the several inspirational statements contained in the Chamber's press releases all point to the existence of a religious purpose. Thus, we are unable to conclude that the district court's finding was clearly erroneous.

 Moreover, even if the district court had found that the purpose for constructing the cross was to promote tourism, this alleged secular purpose would not have provided a sufficient basis for avoiding conflict with the Establishment Clause. Although the promotion of tourism is a secular goal commonly pursued by states, cities and counties alike, a government may not "employ religious means to reach a secular goal unless secular means are wholly unavailing." *School District of Abington Township v. Schempp,* 374 U.S. 203, 294, 83 S.Ct. 1560, 1609, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring); *see Gilfillan v. City of Philadelphia,* 637 F.2d 924, 930 (3d Cir.1980), *cert. denied,* 451 U.S. 987, 101 S.Ct. 2322, 68 L.Ed.2d 845 (1981) (rejecting city's alleged secular purpose of improving public relations by constructing platform, including a cross, for use by the Pope). Finding that the Chamber has failed to establish a secular purpose, we hold that the maintenance of the cross in a state park violates the Establishment Clause of the First Amendment.

 For many years, a cross on Black Rock Mountain State Park has shone over the North Georgia mountains. Yet "historical acceptance without more" does not provide a rational basis for ignoring the command of the Establishment Clause that a state "pursue a course of 'neutrality' toward religion." *Committee for Public Education & Religious Liberty v. Nyquist,* 413 U.S. 756, 792–93, 93 S.Ct. 2955, 2975–76, 37 L.Ed.2d 948 (1973). Moreover, we cannot close our eyes to the light of the cross on the ground that it represents only a minor encroachment of this constitutional command, for the "breach of neutrality that is today a trickling stream may all too soon become a raging torrent." *School District of Abington Township v. Schempp, supra,* 374 U.S. at 225, 83 S.Ct. at 1573; *see Stone v. Graham, supra,* 449 U.S. at 42–43, 101 S.Ct. at 194–195. Accordingly, the cross must be removed.

We AFFIRM the decision of the district court and REMAND for further proceedings consistent with this opinion.