GRABER, Circuit Judge,
joined by dissenting on the issue of jurisdiction but concurring in the judgment:
KOZINSKI, Chief Judge, and RYMER, MICHAEL DALY HAWKINS, and McKEOWN, Circuit Judges,
Plaintiffs Catholic League for Religious and Civil Rights (“Catholic League”), Dr. Richard Sonnenshein, and Valerie Meehan brought this 42 U.S.C. § 1983 action against Defendants City and County of San Francisco, San Francisco Board of Supervisors President Aaron Peskin, and Supervisor Tom Ammiano, challenging their enactment of Resolution of March 21, 2006, No. 168-06. Plaintiffs argue that the resolution violates the Establishment Clause of the First Amendment by impermissibly attacking Plaintiffs’ religion, Catholicism. The resolution concerns a Catholic cardinal and his directive to Catholic Charities CYO of San Francisco (“Catholic Charities”), a non-profit provider of social services, on the topic of adoption by same-sex couples. I would not reach the merits of this dispute. Instead, I would hold that we lack jurisdiction over this case because Plaintiffs lack Article III standing.
The doctrine of standing requires that Plaintiffs demonstrate a concrete and particularized injury caused by the passage of Resolution No. 168-06. But the resolution plainly applies (albeit in a non-binding, hortatory way) only to persons and entities other than Plaintiffs. Plaintiffs do not allege any form of concrete and particularized injury resulting from the resolution; they allege only a deep and genuine offense. It is a bedrock principle of federal courts’ limited jurisdiction that a person’s deep and genuine offense to a defendant’s actions, without more, generally does not suffice to confer standing. Here, Plaintiffs do not allege more.
The doctrine of standing not only ensures robust litigation by interested parties, but also protects the interests of those potential plaintiffs who have chosen, for whatever reason, not to bring suit. Plaintiffs’ allegations suggest that several entities and individuals — including Cardinal Levada, Archbishop Niederauer, and Catholic Charities — likely have standing. Just as much as we must resolve all cases within our jurisdiction, we also must respect the decision by those persons and entities not to sue.
Because a majority of the en banc panel holds that we have jurisdiction, I dissent from that portion of the disposition. But, because I agree with the judgment affirming the district court’s dismissal of the action, I concur in the judgment.
FACTUAL AND PROCEDURAL HISTORY
Catholic Charities is an agency of the San Francisco Archdiocese of the Catholic Church. It operates as a non-profit provider of social services in the Bay Area. Until 2006, Catholic Charities’ services included placing children with adoptive parents.
In March 2006, Cardinal William Joseph Levada, the head of the Congregation for the Doctrine of the Faith, issued a directive to Catholic Charities. The directive instructed Catholic Charities to stop placing children in need of adoption with same-sex couples. The San Francisco Board of Supervisors responded by unanimously adopting a non-binding resolution:
*1063 [Resolution urging Cardinal Levada to withdraw his directive to Catholic Charities forbidding the placement of children in need of adoption with same-sex couples]
Resolution urging Cardinal William Levada, in his capacity as head of the Congregation for the Doctrine of the Faith at the Vatican, to withdraw his discriminatory and defamatory directive that Catholic Charities of the Archdiocese of San Francisco stop placing children in need of adoption with homosexual households.
WHEREAS, It is an insult to all San Franciscans when a foreign country, like the Vatican, meddles with and attempts to negatively influence this great City’s existing and established customs and traditions such as the right of same-sex couples to adopt and care for children in need; and
WHEREAS, The statements of Cardinal Levada and the Vatican that “Catholic agencies should not place children for adoption in homosexual households,” and “Allowing children to be adopted by persons living in such unions would actually mean doing violence to these children” are absolutely unacceptable to the citizenry of San Francisco; and
WHEREAS, Such hateful and discriminatory rhetoric is both insulting and callous, and shows a level of insensitivity and ignorance which has seldom been encountered by this Board of Supervisors; and
WHEREAS, Same-sex couples are just as qualified to be parents as are heterosexual couples; and
WHEREAS, Cardinal Levada is a decidedly unqualified representative of his former home city, and of the people of San Francisco and the values they hold dear; and
WHEREAS, The Board of Supervisors urges Archbishop Niederauer and the Catholic Charities of the Archdiocese of San Francisco to defy all discriminatory directives of Cardinal Levada; now, therefore, be it
RESOLVED, That the Board of Supervisors urges Cardinal William Levada, in his capacity as head of the Congregation for the Doctrine of the Faith at the Vatican (formerly known as Holy Office of the Inquisition), to withdraw his discriminatory and defamatory directive that Catholic Charities of the Archdiocese of San Francisco stop placing children in need of adoption with homosexual households.
Resolution of Mar. 21, 2006, No. 168-06 (bracketed sentence in original). According to the complaint, Defendants also threatened to withhold funding from Catholic Charities if that organization refused to place children with same-sex couples.
Soon thereafter, Plaintiffs brought this action. Plaintiffs allege that the resolution violates the Establishment Clause of the First Amendment. They seek “nominal damages, a declaration that this anti-Catholic resolution is unconstitutional, and a permanent injunction enjoining this and other official resolutions, pronouncements, or declarations against Catholics and their religious beliefs.” In the complaint, Plaintiffs identify themselves and their injuries as follows:
Plaintiff Catholic League is the nation’s largest Catholic civil rights organization. Founded in 1973, the Catholic League defends the right of Catholics— lay and clergy alike — to participate in American public life without defamation or discrimination. The Catholic League has approximately 6,000 members who reside in the City and County of San Francisco. The Catholic League and its members object to, and have been injured by, the anti-Catholic resolution adopted by Defendants. Defendants’ *1064 anti-Catholic resolution attacks the deeply held religious beliefs of Catholics, conveys the impermissible, state-sponsored message of disapproval of and hostility toward the Catholic religion, and sends a clear message to Catholic League, its members, and others who are adherents to the Catholic faith that they are outsiders, not full members of the political community.
Plaintiff Dr. Richard Sonnenshein is a resident of the City and County of San Francisco. He is a devout Catholic, and he objects to and has been injured by the anti-Catholic resolution adopted by Defendants. Defendants’ anti-Catholic resolution attacks Plaintiff Sonnenshein’s deeply held religious beliefs, conveys the impermissible, state-sponsored message of disapproval of and hostility toward the Catholic religion, and sends a clear message to Plaintiff Sonnenshein and others who are adherents to the Catholic faith that they are outsiders, not full members of the political community. Plaintiff Sonnenshein is a member of the Catholic League.
Plaintiff Valerie Meehan is a resident of the City and County of San Francisco. She is a third-generation San Franciscan and a devout Catholic. Plaintiff Meehan objects to and has been injured by the anti-Catholic resolution adopted by Defendants. Defendants’ anti-Catholic resolution attacks Plaintiff Meehan’s deeply held religious beliefs, conveys the impermissible, state-sponsored message of disapproval of and hostility toward the Catholic religion, and sends a clear message to Plaintiff Meehan and others who are adherents to the Catholic faith that they are outsiders, not full members of the political community.
Plaintiffs Sonnenshein and Meehan have had direct contact with and have been injured by the offending anti-Catholic resolution, which stigmatizes Plaintiffs on account of their religious beliefs and conveys a message to them that they are outsiders, not full members of the political community. Plaintiffs Sonnenshein and Meehan, who are citizens and municipal taxpayers of Defendant City and County of San Francisco, have been injured by the abuse of government authority and the misuse of the instruments of government to criticize, demean, and attack their religion and religious beliefs, thereby chilling their access to the government. As a result of Defendants’ anti-Catholic resolution, Plaintiffs Sonnenshein and Meehan will curtail their activities to lessen their contact with Defendants, thereby causing further harm. Plaintiff Catholic League, through its members, has been similarly injured and harmed by Defendants’ anti-Catholic resolution.
(Paragraph numbering omitted.)
Defendants filed a motion to dismiss for failure to state a claim. Defendants argued, on the merits, that the resolution does not violate the Establishment Clause. The district court agreed. In a published opinion, the district court held that the resolution does not violate the Establishment Clause and, therefore, dismissed the case. Catholic League for Religious & Civil Rights v. City of San Francisco, 464 F.Supp.2d 938 (N.D.Cal.2006).
Plaintiffs timely appealed. In a published opinion, a three-judge panel of our court unanimously affirmed, agreeing with the district court that the resolution does not violate the Establishment Clause. Catholic League for Religious & Civil Rights v. City of San Francisco, 567 F.3d 595, 608 (9th Cir.2009). We granted rehearing en banc. 586 F.3d 1166 (9th Cir. 2009).
The parties never raised the issue of Plaintiffs’ Article III standing, and neither the district court nor the panel addressed the issue. Shortly before the date of our *1065 en banc oral argument, we sua sponte directed the parties to file simultaneous briefs on the issue of Article III standing and to be prepared to discuss the issue at oral argument.
STANDARD OF REVIEW
We review de novo the district court’s dismissal for failure to state a claim. Barker v. Riverside Cnty. Office of Educ., 584 F.3d 821, 824 (9th Cir.2009).
DISCUSSION
Before reaching the merits of any case, including an Establishment Clause challenge, we must ensure that the plaintiff has Article III standing. Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004). “The question of standing is not subject to waiver ...: We are required to address the issue even if the courts below have not passed on it, and even if the parties fail to raise the issue before us.” United States v. Hays, 515 U.S. 737, 742, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) (brackets and internal quotation marks omitted). “This obligation to notice defects in ... subject-matter jurisdiction assumes a special importance when a constitutional question is presented. In such eases we have strictly adhered to the standing requirements .... ” Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541-42, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986).[1]
A. Article III Standing in Establishment Clause Cases
The Article III standing requirements “are familiar: The plaintiff must show that the conduct of which he complains has caused him to suffer an ‘injury in fact’ that a favorable judgment will redress.” Newdow, 542 U.S. at 12, 124 S.Ct. 2301 (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). Familiar though the requirements may be, the Supreme Court also has cautioned that standing is not a precise doctrine. See id. at 11, 124 S.Ct. 2301 (“The standing requirement is born partly of ‘an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government.’ ”) (quoting Allen v. Wright, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)); Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 475, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (stating that “the concept of ‘Art. Ill standing’ has not been defined with complete consistency ... [and] cannot be reduced to a one-sentence or one-paragraph definition”).
That imprecision is manifest in the Establishment Clause context. Courts regularly have noted that it can be difficult to determine whether an Establishment Clause plaintiff has alleged an “injury in fact” for purposes of Article III standing. See, e.g., Cooper v. U.S. Postal Serv., 577 F.3d 479, 489-90 (2d Cir.2009) (“[S]o far the [Supreme] Court has announced no reliable and handy principles of analysis.... Lower courts are left to find a threshold for injury and determine somewhat arbitrarily whether that threshold has been reached.... In short, there is uncertainty concerning how to apply the injury in fact requirement in the Establishment Clause context.”), cert. de *1066 nied, — U.S. -, 130 S.Ct. 1688, 176 L.Ed.2d 180 (2010); Vasquez v. Los Angeles Cnty., 487 F.3d 1246, 1250 (9th Cir. 2007) (“The concept of a ‘concrete’ injury is particularly elusive in the Establishment Clause context.”); Suhre v. Haywood Cnty., 131 F.3d 1083, 1085 (4th Cir.1997) (same); Murray v. City of Austin, 947 F.2d 147, 151 (5th Cir.1991) (same); Saladin v. City of Milledgeville, 812 F.2d 687, 691 (11th Cir.1987) (same). The difficulty stems, at least in part, from the nature of the asserted “injury in fact.” Unlike most other types of cases, in which the plaintiff suffers a physical injury or a pecuniary loss, the plaintiff in an Establishment Clause case usually does not suffer those types of harm. Vasquez, 487 F.3d at 1250-51; Suhre, 131 F.3d at 1086. Instead, the plaintiff in an Establishment Clause case typically asserts only that the government’s action has caused an injury in fact to “non-economic interests of a spiritual, as opposed to a physical or pecuniary, nature.” Vasquez, 487 F.3d at 1250-51; see Suhre, 131 F.3d at 1086 (holding that “ ‘the spiritual, value-laden beliefs of the plaintiffs’ are often most directly affected by an alleged establishment of religion” (quoting ACLU of Ga. v. Rabun Cnty. Chamber of Commerce, Inc., 698 F.2d 1098, 1102 (11th Cir.1983) (per curiam))).
The Supreme Court has made clear that this sort of harm — injury to interests of a spiritual nature — can suffice to establish an “injury in fact” for purposes of Article III standing. See, e.g., Ass’n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 154, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) (“A person or a family may have a spiritual stake in First Amendment values sufficient to give standing to raise issues concerning the Establishment Clause.... ”). But it is equally clear that an asserted injury of that nature does not grant the plaintiff carte blanche to federal-court resolution of Establishment Clause challenges. Valley Forge, 454 U.S. at 485, 102 S.Ct. 752.
Even though the injury is spiritual in nature, the injury also must be direct and personal to the particular plaintiff. “ ‘The essence of the standing inquiry is whether the [plaintiffs] have alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.’ ” Larson v. Valente, 456 U.S. 228, 238-39, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982) (quoting Duke Power Co. v. Carolina Envtl. Study Group, Inc., 438 U.S. 59, 72, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978)). “[B]ut standing is not measured by the intensity of the litigant’s interest or the fervor of his advocacy.” Valley Forge, 454 U.S. at 486, 102 S.Ct. 752. “[A]t an irreducible minimum, Art. Ill requires the [plaintiff] to ‘show that he personally has suffered some actual or threatened injury. ...’” Id. at 472, 102 S.Ct. 752 (emphasis added) (quoting Gladstone, Realtors v. Vill. of Bellwood, 441 U.S. 91, 99, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979)); see also Lujan, 504 U.S. at 560 & n. 1, 112 S.Ct. 2130 (holding that an “injury in fact” “must affect the plaintiff in a personal and individual way” (emphasis added)). A plaintiff “ ‘must allege facts showing that he is himself adversely affected ... [in part] to put the decision as to whether review will be sought in the hands of those who have a direct stake in the outcome.’ ” Valley Forge, 454 U.S. at 473, 102 S.Ct. 752 (emphasis added) (quoting Sierra Club v. Morton, 405 U.S. 727, 740, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)). The requirement of a direct and personal injury in part “reflects a due regard for the autonomy of those persons likely to be most directly affected by a judicial order.” Id.
*1067 In Valley Forge, 454 U.S. at 467-68, 102 S.Ct. 752, the plaintiffs brought an Establishment Clause challenge to a transfer of land from the federal government to a religious organization. The plaintiffs had never visited the land in question, nor did they have any other direct connection to it. The Court held that the plaintiffs “fail[ed] to identify any personal injury suffered by them as a consequence of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees. That is not an injury sufficient to confer standing under Art. Ill.... ” Id. at 485, 102 S.Ct. 752 (emphasis omitted).
The plaintiffs in Valley Forge maintained that the Court’s earlier cases had held “that any person asserting an Establishment Clause violation possesses a ‘spiritual stake’ sufficient to confer standing.” Id. at 486 n. 22, 102 S.Ct. 752. The Court disagreed and illustrated the plaintiffs’ error by reference to two cases raising challenges to required Bible readings in public schools: School District v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); and Doremus v. Board of Education, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952). In Doremus, the Court lacked jurisdiction because the student had graduated but, in Schempp, the student was still in school, so the Court held that the plaintiffs had standing. Compare Doremus, 342 U.S. at 432-33, 72 S.Ct. 394, with Schempp, 374 U.S. at 224 n. 9, 83 S.Ct. 1560. In Valley Forge, the Court explained: “The plaintiffs in Schempp had standing, not because their complaint rested on the Establishment Clause — for as Doremus demonstrated, that is insufficient — but because impressionable schoolchildren were subjected to unwelcome religious exercises or were forced to assume special burdens to avoid them.” Valley Forge, 454 U.S. at 487 n. 22, 102 S.Ct. 752; see also Schempp, 374 U.S. at 224 n. 9, 83 S.Ct. 1560 (“The parties here are school children and their parents, who are directly affected by the laws and practices against which their complaints are directed.”).
The courts have developed a substantial body of case law interpreting Valley Forge’s holding that the plaintiff must allege a direct and personal injury other than “the psychological consequence presumably produced by observation of conduct with which one disagrees.”[2] 454 U.S. at 485, 102 S.Ct. 752. Below, I describe three general categories of cases. First, and most directly relevant here, I describe cases involving a specific governmental policy or statutory provision, in which the plaintiff challenges the policy or provision directly. As discussed below, the cases have held that a plaintiff has standing to challenge the policy or provision only if the plaintiff proves that the enactment applies directly to him or her. A generalized objection to the policy or provision is insufficient.
The requirement that the plaintiff demonstrate that the policy or provision applies directly to him or her is consistent with the courts’ approach in the second and third categories of cases. In religious exercise cases, the courts have addressed situations in which the plaintiff challenges *1068 some form of religious invocation at a public gathering or ceremony. The courts have held that a plaintiff has standing to challenge a religious exercise only if the plaintiff is directly subjected to the unwelcome exercise. Similarly, in the religious display cases, the courts have addressed situations in which the plaintiff challenges a religious display on public property. The courts have held that a plaintiff has standing to challenge a religious display only if the plaintiff has altered his or her behavior or if the plaintiff has direct and unwelcome contact with the display.
Those principles — established through longstanding and consistent analysis by the Supreme Court, by us, and by our sister circuits — constitute an important source of law and guide our analysis here. Accordingly, I cannot understand the majority’s assertion that my opinion requires that these “cases must somehow be distinguished ... or overruled.” Maj. op. at 1050. In no way do I suggest that these cases do not “retain their vitality” or that they “are overruled.” Id. To the contrary, I extract from these cases certain principles of law that we must apply here, to this case. Accordingly, my analysis of standing is entirely consistent with the existing body of law. It is the majority opinion that fails to explain how a conclusion of standing in this case is consistent with that substantial body of law — a body of law discussed in detail in this opinion but referenced only in passing, in list form, in the majority opinion.
Furthermore, the list in the majority opinion identifies the constitutional issues that either the Supreme Court or we have addressed in an earlier case. Maj. op. at 1049-50. The majority then concludes that, because the courts have addressed those issues, surely a finding of standing in this case is consistent with those cases. See id. at 1050 (“If we conclude that plaintiffs in the case before us have standing, we need not decide whether those cases retain their vitality or are overruled, because our conclusion would be consistent with them.”). But standing focuses on the plaintiff, not on the issue. That this case raises an interesting constitutional issue similar to issues addressed in previous cases is, quite simply, beside the point.[3] The relevant questions are whether the plaintiff has suffered a cognizable injury and whether that injury is redressable. It is to those relevant questions that I now turn.
1. Governmental Policies or Statuto'ry Provisions
In many cases, including recent ones, plaintiffs have raised Establishment Clause challenges to specific governmental policies or statutory provisions. See, e.g., Larson, 456 U.S. at 230-34, 102 S.Ct. 1673 (state statute imposing registration and reporting requirements on “religious organizations”); Newdow v. Lefevre, 598 F.3d 638, 641 (9th Cir.2010) (federal statute declaring the national motto “In God We Trust”); Newdow v. Rio Linda Union Sch. Dist., 597 F.3d 1007, 1012-13 (9th Cir.2010) (federal statute codifying the pledge of allegiance as including the words “under God”); Chaplaincy of Full Gospel Churches v. U.S. Navy (In re Navy Chaplaincy), 534 F.3d 756, 758-59 (D.C.Cir. 2008) (federal policy concerning navy ehap *1069 lains’ retirement benefits), cert. denied,. — U.S. -, 129 S.Ct. 1918, 173 L.Ed.2d 1060 (2009); Graham v. Deukmejian, 713 F.2d 518, 519 (9th Cir.1983) (state policy requiring blood transfusions during certain surgeries, contrary to religious beliefs of Jehovah’s Witnesses); Flora v. White, 692 F.2d 53, 54 (8th Cir.1982) (per curiam) (state constitutional provision requiring certain officeholders and witnesses to profess their belief in the existence of “a God”); see also Am. Family Ass’n v. City of San Francisco, 277 F.3d 1114, 1119-20 (9th Cir.2002) (municipal board of supervisors’ formal disapproval of an advertising campaign by religious groups);[4] cf. Smelt v. Cnty. of Orange, 447 F.3d 673, 676-77 (9th Cir.2006) (challenge to federal statute concerning same-sex marriages on other constitutional grounds). The courts have held that, if the statute or policy applies to the plaintiff in a concrete manner, then the plaintiff has standing. See Larson, 456 U.S. at 241,102 S.Ct. 1673 (“The threatened application of [the statutory provision] to the Church surely amounts to a distinct and palpable injury to [the plaintiffs]: It disables them from soliciting contributions in the State of Minnesota unless the Church complies with registration and reporting requirements that are hardly de minimis.”)', Graham, 713 F.2d at 519 (“The Witnesses must show that they have suffered injury, or that future injury is threatened, as a result of the defendants’ conduct. The Witnesses have so alleged, claiming that blood transfusions are contrary to their religious beliefs and that California’s actions threaten to discourage physicians from performing certain operations without such transfusions.” (citation omitted)). If the plaintiffs are not subject to the challenged provision, however, they lack the requisite particularized harm. See Lefevre, 598 F.3d at 643 (holding that the plaintiff lacked standing to challenge the statute declaring the national motto “In God We Trust” because the allegation that, because of the statute, the plaintiff is a “political outsider” and suffers “a stigmatic injury” “is insufficient to confer standing”); Rio Linda, 597 F.3d at 1016 (holding that the plaintiff lacked standing to challenge the federal statute codifying the pledge of allegiance as including the words “under God” because the plaintiff sustained no personal injury where “nothing in the Pledge [or the statute codifying it] actually requires anyone to recite it”); In re Navy Chaplaincy, 534 F.3d at 758 (holding that navy chaplain plaintiffs could not challenge the U.S. Navy’s alleged policy of discrimination in its retirement system, in favor of Catholic navy chaplains, because the plain *1070 tiffs themselves had not suffered discrimination); Flora, 692 F.2d at 54 (holding that atheist plaintiffs lacked standing to challenge a discriminatory state constitutional provision because the provision had never been applied to the plaintiffs); see also Smelt, 447 F.3d at 683-86 (holding that plaintiff same-sex couple lacked standing to challenge federal statute denying benefits to married same-sex couples, because the plaintiffs were not married under state law and had not been denied any federal benefits or rights).
2. Religious Exercise Cases
In a second category, plaintiffs have brought Establishment Clause challenges to some form of religious invocation at a public gathering or ceremony. See, e.g., Schempp, 374 U.S. at 205-06, 83 S.Ct. 1560 (daily scripture readings in public school); Doremus, 342 U.S. at 430, 72 S.Ct. 394 (same); Rio Linda, 597 F.3d at 1012-13 (recitations of the pledge of allegiance in public school); Pelphrey v. Cobb Cnty., 547 F.3d 1263, 1266 (11th Cir.2008) (invocations at beginning of county planning meetings); Doe v. Tangipahoa Parish Sch. Bd., 494 F.3d 494, 496-99 (5th Cir.2007) (en banc) (invocations at school board meetings); Doe v. Sch. Dist. of Norfolk, 340 F.3d 605, 607-08 (8th Cir.2003) (scheduled invocation and benediction at high school graduation); Doe v. Sch. Bd. of Ouachita Parish, 274 F.3d 289, 291 (5th Cir.2001) (prayers at public school); Doe v. Madison Sch. Dist. No. 321, 177 F.3d 789, 791 (9th Cir.1999) (en banc) (student prayers at high school graduations); see also Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 294, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (student prayers at high school football games); Lee v. Weisman, 505 U.S. 577, 580-83, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (prayers at graduation ceremonies); Wallace v. Jaffree, 472 U.S. 38, 40-42, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (school prayer and meditation); Engel v. Vitale, 370 U.S. 421, 422-23, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) (school prayer).[5] In Valley Forge, 454 U.S. at 487 n. 22, 102 S.Ct. 752, the Court examined Doremus and Schempp and explained that a plaintiff has standing if he or she has actually been “subjected to unwelcome religious exercises.” Accordingly, a plaintiff who did not attend an event at which the religious invocation occurred had never actually been “subjected to unwelcome religious exercises,” id., and therefore lacked standing. See Tangipahoa Parish, 494 F.3d at 497-98 (holding that the plaintiffs lack standing because “there is no evidentiary proof that any of the [plaintiffs] ever attended a school board session at which a prayer ... was recited”); see also Madison, 177 F.3d at 797 (holding that a parent plaintiff did not have standing where “she does not claim that she will attend another graduation ceremony in the future”). When plaintiffs regularly attend events at which an invocation occurs, however, the plaintiffs have standing because, they have been subjected to unwelcome religious exercises. See Pelphrey, 547 F.3d at 1279-80 (regular attendee at county planning commission meetings); Ouachita Parish, 274 F.3d at 292 (students at public schools exposed to daily prayer).
The Eighth Circuit considered an interesting combination of these two ex *1071 tremes in Norfolk. There, the public school announced to the student body, at a mandatory graduation rehearsal, that the impending graduation ceremony would include an invocation and benediction. Norfolk, 340 F.3d at 607. After the ACLU and a parent expressed concern, the school dropped the invocation and benediction from the scheduled ceremony. Id. During the ceremony, however, a member of the school board interrupted his speech to lead the audience through a recitation of the Lord’s Prayer. Id. at 608. An offended student and his mother sued the school district and certain members of the school board. Id.
The court had “little trouble” concluding that the plaintiffs had standing to challenge the actions of the School Board member who read the prayer (and the other defendants, on the theory that they were complicit). Id. at 609. After all, the plaintiffs “were subjected to an unwelcome religious recitation at a school function.” Id. But whether the plaintiffs had standing to challenge the school’s “past policy of allowing prayer at graduation ceremonies[] present[ed] a much closer issue.” Id. The court acknowledged that the school’s announcement to the students at the mandatory rehearsal that, consistent with the school’s tradition, the graduation ceremony would include an invocation and benediction constituted some personal contact with an endorsement of religion. Id. at 609-10. Nevertheless, the court concluded that the plaintiffs lacked standing to pursue this claim, both because the plaintiffs’ contact with endorsement was insufficient and because the plaintiffs did not allege that the past policy caused them any particularized injury. Id.
3. Religious Display Cases
In a legion of cases, plaintiffs have challenged religious displays. See, e.g., Lefevre, 598 F.3d at 640 (national motto “In God We Trust” on the nation’s coins and currency); ACLU of Ky. v. Grayson Cnty., 591 F.3d 837, 840-41 (6th Cir.2010) (Ten Commandments in county courthouse); Cooper, 577 F.3d at 484 (religious displays at post office); Green v. Haskell Cnty. Bd. of Comm’rs, 568 F.3d 784, 787-88 (10th Cir.2009) (Ten Commandments on courthouse green), cert. denied, — U.S.-, 130 S.Ct. 1687, 176 L.Ed.2d 180 (2010); Caldwell v. Caldwell, 545 F.3d 1126, 1128 (9th Cir.2008) (religious statements on public university’s website), cert. denied, — U.S. -, 129 S.Ct. 1617, 173 L.Ed.2d 995 (2009); Bames-Wallace v. City of San Diego, 530 F.3d 776, 783 (9th Cir.2008) (order) (Boy Scout symbols in public park), cert, denied, — U.S. -, 130 S.Ct. 2401, 176 L.Ed.2d 922 (2010); Vasquez, 487 F.3d at 1247-48 (removal of cross on county seal); O’Connor v. Wash-bum Univ., 416 F.3d 1216, 1218-19 (10th Cir.2005) (statue of Roman Catholic bishop displayed at public university in outdoor art show); Books v. Elkhart Cnty., 401 F.3d 857, 858 (7th Cir.2005) (Ten Commandments on public property); ACLU of Ohio Found., Inc. v. Ashbrook, 375 F.3d 484, 487 (6th Cir.2004) (Ten Commandments on courtroom wall); Buono, 371 F.3d at 544 (cross on a hill); ACLU Neb. Found, v. City of Plattsmouth, 358 F.3d 1020, 1024-25 (8th Cir.2004) (Ten Commandments in public park), adopted in relevant part, 419 F.3d 772, 775 n. 4 (8th Cir.2005) (en banc); Glassroth v. Moore, 335 F.3d 1282, 1284 (11th Cir.2003) (Ten Commandments monument at Alabama State Judicial Building); Adland v. Russ, 307 F.3d 471, 474-75 (6th Cir.2002) (Ten Commandments on public property); ACLU-NJ v. Twp. of Wall, 246 F.3d 258, 260 (3d Cir.2001) (holiday display on public property); Books v. City of Elkhart, 235 F.3d 292, 294 (7th Cir.2000) (Ten Commandments on front lawn of municipal building); Suhre, 131 F.3d at 1084 (Ten Commandments in county courthouse); *1072 Separation of Church & State Comm. v. City of Eugene, 93 F.3d 617, 618 (9th Cir.1996) (per curiam) (51-foot Latin cross on butte in city park); Doe v. Cnty. of Montgomery, 41 F.3d 1156, 1157 (7th Cir. 1994) (the words “THE WORLD NEEDS GOD” above entrance to county courthouse); Washegesic v. Bloomingdale Pub. Schs., 33 F.3d 679, 681 (6th Cir.1994) (painting of Jesus Christ in public school hallway); Gonzales v. N. Twp. of Lake Cnty., 4 F.3d 1412, 1414 (7th Cir.1993) (crucifix in public park); Ellis v. City of La Mesa, 990 F.2d 1518, 1520 (9th Cir. 1993) (giant crosses on public land and on city insignia); Murray, 947 F.2d at 149 (cross on city seal); Hewitt v. Joyner, 940 F.2d 1561,1562-63 (9th Cir.1991) (religious statues in public park); Harris v. City of Zion, 927 F.2d 1401, 1402 (7th Cir.1991) (crosses on city seal); Freedom from Religion Found., Inc. v. Zielke, 845 F.2d 1463, 1465 (7th Cir.1988) (Ten Commandments in public park); Saladin, 812 F.2d at 688-89 (the word “Christianity” on city seal); ACLU of Ill. v. City of St. Charles, 794 F.2d 265, 267 (7th Cir.1986) (lighted cross on public property); Hawley v. City of Cleveland, 773 F.2d 736, 737 (6th Cir.1985) (chapel in public airport); Rabun Cnty., 698 F.2d at 1100-01 (lighted cross in a public park); see also McCreary Cnty. v. ACLU of Ky., 545 U.S. 844, 851, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005) (“large, gold-framed copies” of the Ten Commandments at county courthouses “posted in a very high traffic area of the courthouse” (internal quotation marks omitted)); Van Orden v. Perry, 545 U.S. 677, 681, 125 S.Ct. 2854, 162 L.Ed.2d 607 (2005) (Ten Commandments monolith standing “6-feet high and 3 1/2-feet wide” in public park); Cnty. of Allegheny v. ACLU Greater Pittsburgh Chapter, 492 U.S. 573, 578, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (ceéche in county courthouse and menorah outside county building); Lynch v. Donnelly, 465 U.S. 668, 671, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (creche containing figures “ranging in height from 5 [inches] to 5 [feet]”).[6] In each case, the plaintiffs alleged that they were deeply offended by the presence of the religious display on public property and sought its removal.
The courts consistently have applied the same general legal rules. A plaintiff has standing to challenge a religious display if he or she alleges a change in behavior (for instance, affirmative avoidance of the religious display). Rabun Cnty., 698 F.2d at 1108. But, although an allegation of a change in behavior is sufficient to confer standing, it is not required. Vasquez, 487 F.3d at 1251-52; Suhre, 131 F.3d at 1087-88; Foremaster v. City of St. George, 882 F.2d 1485, 1490-91 (10th Cir.1989); Saladin, 812 F.2d at 692-93.[7] A plaintiff also has standing when he or she has alleged “direct and unwelcome contact” with the *1073 religious display. Grayson Cnty., 591 F.3d at 843; Green, 568 F.3d at 794; Books, 401 F.3d at 861; City of Plattsmouth, 358 F.3d at 1030; accord Lefevre, 598 F.3d at 642 (“unwelcome direct contact”); Caldwell, 545 F.3d at 1132 (same); Vasquez, 487 F.3d at 1253 (same); Ashbrook, 375 F.3d at 490 (“direct, unwelcome contact”); Suhre, 131 F.3d at 1088 (“direct unwelcome contact”). In the absence of “direct and unwelcome contact,” however, a plaintiff cannot meet the standing requirements, even if he or she has contact with a religious display and is offended by it: “In certain cases, a plaintiffs contact with an allegedly offensive religious or anti-religious symbol will remain too tenuous, indirect, or abstract to give rise to Article III standing.” Vasquez, 487 F.3d at 1251; see also Caldwell, 545 F.3d at 1132-33 (holding that the plaintiffs injury was insufficient for standing purposes because of the tenuous nature of the connection between a website user and the religious message on a webpage and because her contact with the web site was less forced than in Vasquez)-, Cnty. of Montgomery, 41 F.3d at 1161-62 (holding that a lawyer did not have standing to challenge a religious display in a courthouse where the lawyer had not alleged that he would have any contact with the display); Washegesic, 33 F.3d at 682 (noting that “psychological harm alone is not always a sufficient injury for standing purposes when contact [with a religious display such as a picture of Jesus Christ in a school’s hallway] is indirect”); Harris, 927 F.2d at 1406 (holding that “the fact that the plaintiffs may be offended by the seals ... does not confer standing”).
A plaintiff who challenges a religious display meets the “direct and unwelcome contact” requirement by demonstrating some level of frequent or regular contact with the display during the course of the plaintiffs regular routine, such that the plaintiff was “forced” to encounter the display. For example, in Vasquez, 487 F.3d at 1251-52, the plaintiff challenged the existence of a cross on a county seal — which he encountered on a regular basis as a county resident and county employee. We held that the plaintiff had standing because he “held himself out as a member of the community where the seal is located, as someone forced into frequent regular contact with the seal, and perhaps most importantly, as someone ‘directly affected’ by his ‘unwelcome direct contact’ with the seal.” Id. at 1251 (emphases added). We explained further:
Unlike plaintiffs in Valley Forge, who were physically removed from defendant’s conduct, Vasquez is a member of the community where the allegedly offending symbol is located, and his contact with the symbol was frequent and regular, not sporadic and remote. In fact, ... the offending symbol “will be displayed on county buildings, vehicles, flags, stationary [sic], forms, commendations, uniforms, and elsewhere through LA County,” thereby forcing Vasquez into unwelcome “daily contact and exposure” of the most pervasive kind. These facts and allegations make Vasquez’s status fundamentally different from that of plaintiffs in Valley Forge.
Id. at 1252 (emphases added).
As another example, in Suhre, 131 F.3d at 1084-85, the plaintiff challenged a display of the Ten Commandments in the main courtroom of the county courthouse. The Fourth Circuit held that the plaintiff had standing because of his regular visits to that courtroom, both as a frequent litigant and as a participant in local government meetings (as a plaintiff and witness in past civil actions, as a defendant in criminal actions, and as an attendee at four past meetings of local government). Id. at 1090. The court found it relevant that the plaintiff “must confront the religious sym *1074 bolism whenever he enters the courtroom on either legal or municipal business.” Id. (emphasis added).
Vasquez and Suhre are but two examples: In all other cases, too, the courts have held that the plaintiff has standing because of some level of regular or frequent contact with the religious display during the course of the plaintiffs routine business. See, e.g., Lefevre, 598 F.3d at 642 (the plaintiff encounters the national motto on “coins and currency in everyday life” which “forces him repeatedly to encounter a religious belief he finds offensive” (emphasis added)); Green, 568 F.3d at 793-94 (the plaintiff visits the courthouse “on a weekly basis” for business and avocational purposes and “cannot avoid” the religious display); O’Connor, 416 F.3d at 1223 (the plaintiff professor and student “were frequently brought into direct and unwelcome contact” with a religious display “at a prominent location on campus” (emphasis added)); Ashbrook, 375 F.3d at 489-90 (the plaintiff “who travels to and must practice law within [the relevant] courtroom from time to time” and who “has and would ■ continue to come into direct, unwelcome contact with the Ten Commandments display, the removal of which would, no doubt, prevent further injury to him” (emphases added)); Glassroth, 335 F.3d at 1292 (“The three plaintiffs are attorneys whose professional duties require them to enter the Judicial Building regularly, and when they do so they must pass by the monument.” (emphases added)); Saladin, 812 F.2d at 692 (the plaintiffs “regularly receive correspondence on city stationery bearing the seal [that contains the word ‘Christianity’]” (emphasis added)); see also Twp. of Wall, 246 F.3d at 266 (noting that it was relevant whether the plaintiff visited a holiday display only “to describe the display for this litigation or whether, for example, he observed the display in the course of satisfying a civic obligation”).
To be sure, courts have “recognized that ‘[t]he practices of our own community may create a larger psychological wound than someplace we are just passing through.’ ” Suhre, 131 F.3d at 1087 (alteration in original) (quoting Washegesic, 33 F.3d at 683). Accordingly, “where there is a personal connection between the plaintiff and the challenged display in his or her community, standing is more likely to lie.” Id.; see also City of Plattsmouth, 358 F.3d at 1030 (“That the injuries are caused by [the plaintiffs] own City is all the more alienating.”); City of St. Charles, 794 F.2d at 268 (“Maybe it ought to make a difference if ... a plaintiff is complaining about the unlawful establishment of a religion by the city, town, or state in which he lives.”). But no court has adopted a per se rule that the location of a religious display in the plaintiffs hometown or home state automatically confers standing on the plaintiff. See Suhre, 131 F.3d at 1087 (holding that, where the display is in the plaintiffs community, “standing is more likely to lie” only “where there is a personal connection between the plaintiff and the challenged display” (emphases added)); Rabun Cnty., 698 F.2d at 1107 (holding that the location of the display in the plaintiffs’ home state was one of several relevant “factors”). As in all cases, even when the religious display is in the plaintiffs hometown, the plaintiff must establish direct and unwelcome contact with the display. See, e.g., Suhre, 131 F.3d at 1090 (determining whether the plaintiff has the requisite direct and unwelcome contact with the display, even though the display is located in the plaintiffs municipality).
Finally, the injury arises not purely from the psychological harm of viewing the display, but from the consequence of that harm. That is, a plaintiffs negative reaction to a religious display on public property interferes with the plaintiffs right to “ ‘freely use public areas.’ ” Ellis, 990 F.2d *1075 at 1523 (quoting Hetvitt, 940 F.2d at 1564); accord Ouachita Parish, 274 F.3d at 292 (“use or enjoyment of a public facility”); City of Eugene, 93 F.3d at 619 n. 2 (“freely using the area on and around [the public park]”); Gonzales, 4 F.3d at 1417 (“full use and enjoyment of the public park”); Hawley, 773 F.2d at 740 (“impairment of their beneficial use of a public facility which they frequently use”). “We have repeatedly held that inability to unreservedly use public land suffices as injury-in-fact. Such inhibition constitutes ‘personal injury suffered ... as a consequence of the alleged constitutional error,’ beyond simply ‘the psychological consequence presumably produced by observation of conduct with which one disagrees.’ ” Buono, 371 F.3d at 547 (citations omitted) (ellipsis in original) (quoting Valley Forge, 454 U.S. at 485, 102 5.Ct. 752); see also Barnes-Wallace, 530 F.3d at 784 (“As in Buono, [the plaintiffs] have alleged injuries beyond ‘the psychological consequence presumably produced by observation of conduct with which they disagree,’ because their inhibition interferes with their personal use of the land.” (brackets omitted) (quoting Valley Forge, 454 U.S. at 485, 102 S.Ct. 752)).
B. Resolution No. 168-06 and Alleged Harm to Plaintiffs
Plaintiffs challenge Resolution No. 168-06. They allege that the resolution “attacks [their] deeply held religious beliefs,” “stigmatizes Plaintiffs on account of their religious beliefs,” and “sends a clear message ... that they are outsiders, not full members of the political community.” Plaintiffs allege that, as residents of San Francisco and members of the Catholic Church, the resolution “chill[s] their access to the government.” “As a result of [the] resolution, Plaintiffs ... will curtail their activities to lessen their contact with Defendants, thereby causing further harm.”
In some ways, Plaintiffs’ allegations evince a much stronger connection to the challenged governmental action than the plaintiffs’ allegations in Valley Forge. The plaintiffs in Valley Forge had never visited, and had no other connection to, the land in question. Here, Plaintiffs reside in San Francisco, and Defendants operate as the San Francisco municipal government. There is no geographical separation. Additionally, Plaintiffs view the resolution as a direct attack on their specific religion: Catholicism. There may be some stronger connection to the challenged government action when the action is perceived as a direct attack on one’s own religion, as distinct from a more general offense that the government is condoning or conveying religious messages with which one generally disagrees or to which one does not adhere. I acknowledge that Plaintiffs’ residency and their perception of the government action as attacking their specific religion distinguish this case in significant ways from the Supreme Court’s Valley Forge decision.
In other ways, however, the allegations in the complaint suggest that Plaintiffs are more akin to “concerned bystanders,” Valley Forge, 454 U.S. at 473, 102 S.Ct. 752 (internal quotation marks omitted), who have suffered no injury “other than the psychological consequence presumably produced by observation of conduct with which one disagrees,” id. at 485, 102 S.Ct. 752. The parties do not dispute that the resolution is entirely non-binding and that it has no legal effect. It confers no benefits or legal rights. It imposes no obligations or responsibilities on anyone. It alters no government process, ordinance, or plan. In short, it does not do anything, other than to “urge” Cardinal Levada to withdraw his directive concerning Catholic Charities’ adoption policies. This hortatory resolution is like precatory text in a statute’s preamble, which plaintiffs lack standing to challenge unless the text applies to them “in some concrete way.” Webster v. Reprod. Health Servs., 492 U.S. *1076 490, 506, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989); see also id. at 504-07, 109 S.Ct. 3040 (discussing this issue generally).
As discussed above, Plaintiffs are not the first to challenge a governmental policy or provision.[8] And, as discussed above, the courts have developed consistent requirements for establishing standing: In order to establish standing, Plaintiffs must allege that the provision applies to them in some direct and concrete manner. Plaintiffs’ allegations here do not suffice.
Plaintiffs do not, and could not, claim that they are subject to the provisions of the non-binding resolution. They do not claim to be subject to the government’s action — the “urging” of Cardinal Levada to retract his earlier directive. Instead, they claim harm from the “message” that the resolution’s terms “sends” to Plaintiffs. I agree with the District of Columbia Circuit that, “[wjhen plaintiffs are not themselves affected by a government action except through their abstract offense at the message allegedly conveyed by that action, they have not shown injury-in-fact to bring an Establishment Clause claim.” In re Navy Chaplaincy, 534 F.3d at 764-65.
Plaintiffs here have expressed then-deep and genuine offense. Their status as Catholics and San Francisco residents distinguishes their concerns, at least to some extent, from the concerns of others who may view the resolution as offensive. In the end, however, the resolution carries no legal effect and, perhaps most importantly, does not apply to Plaintiffs.
Plaintiffs effectively ask us to hold that any person has standing to challenge any governmental action on Establishment Clause grounds, so long as the plaintiff resides within the government’s territory and is offended by the action’s alleged attack on the plaintiffs religion. As discussed above, in Part A, a governmental action within one’s own community suggests that standing is more likely to lie. But the courts have declined to apply a per se rule that those who reside within the geographic boundaries of the government automatically have standing to challenge the government’s actions. Instead, the courts have required a showing that the challenged action actually affects these particular plaintiffs. Resolution No. 168-06 simply does not apply to Plaintiffs.
Nor does the fact that Plaintiffs perceive the resolution as a direct attack on their specific religion suffice to meet the “particularized” requirement.[9] In that regard, *1077 Plaintiffs’ claims here are indistinguishable from the plaintiffs’ claims in Flora, 692 F.2d at 54. There, the atheist plaintiffs, who resided in Arkansas, challenged a state constitutional provision that barred atheists from certain civic opportunities. Id. The Eighth Circuit held that, unless the plaintiffs could demonstrate that they had been, or would be, actually subject to the provision (which they could not), the plaintiffs lacked standing. Id. Citing Valley Forge, the court rejected the plaintiffs’ theory that, “as atheists, they have suffered adverse psychological consequences as a result of the continued presence of this section in the Arkansas Constitution.” Id. Like the Arkansas atheists in Flora, the San Francisco Catholics here cannot demonstrate that they are subject to the challenged provision, even though they allege adverse psychological consequences as a result of the resolution’s passage. Accordingly, Plaintiffs do not have standing.
The same analysis applies to our recent decisions involving atheist plaintiffs’ challenge to the national motto, “In God We Trust,” Lefevre, 598 F.3d at 643, and to the inclusion of the words “under God” in the national pledge of allegiance, Rio Linda, 597 F.3d at 1016. In those cases, the plaintiffs challenged not only the federal statute declaring our national motto and the federal statute adding the words “under God” to our pledge of allegiance, but the plaintiffs also challenged the statutes and policies that required that the motto be inscribed on our coins and currency and that the pledge be recited in schools. Lefevre, 598 F.3d at 643; Rio Linda, 597 F.3d at 1016. We held that the plaintiffs lacked standing to challenge the first type of statute: the federal statute declaring our national motto, Lefevre, 598 F.3d at 643, and the federal statute adding the words “under God” to our pledge of allegiance, Rio Linda, 597 F.3d at 1016. The fact that a statute on the books made the plaintiff feel like a “political outsider[]” and “inflict[ed] a stigmatic injury” was “insufficient to confer standing.” Lefevre, 598 F.3d at 643; see also Rio Linda, 597 F.3d at 1016 (holding that, “because the Pledge does not mandate that anyone say it, [the plaintiff] has no personal injury to contest its wording in the courts” and therefore lacks standing to challenge the federal statute declaring the pledge). By contrast, we held that the plaintiff did have “standing to challenge the statutes that require the inscription of the motto on coins and currency ... given the ubiquity of coins and currency in everyday life,” Lefevre, 598 F.3d at 642, and that plaintiff parents of schoolchildren did have standing to challenge the state statute and school district policy permitting teachers to lead students through recitation of the pledge of allegiance, Rio Linda, 597 F.3d at 1016. Those statutes had a direct effect on the plaintiffs.
Here, Plaintiffs challenge the resolution only. As in Lefevre and Rio Linda, Plaintiffs allege that the governmental action makes them feel like political outsiders and stigmatizes them because of their religious beliefs. And, as in Lefevre and Rio Linda, those allegations are insufficient. Plaintiffs’ contact with the resolution here is no greater than the plaintiffs’ contact with the federal statutes at issue in Lefevre and Rio Linda.
In those cases, we held, of course, that the plaintiffs had standing to challenge other statutes and policies — those statutes that put the plaintiffs in direct and unwelcome contact with the religious statement or religious exercise. But, in this case, *1078 there are no such other statutes or policies and no such direct and unwelcome contact. Clearly, Defendants have in no way inscribed the resolution on an item of everyday life such that Plaintiffs must encounter it, and Defendants have in no way required Plaintiffs to participate in a daily recitation of the resolution. Plaintiffs’ challenge is limited to the resolution itself, which sets forth Defendants’ policy statement on a matter of concern to the City — the precise parallel to the federal statutes setting forth our national motto and pledge of allegiance. Just as the plaintiffs’ deep offense at the national motto and pledge of allegiance could not confer standing, neither can Plaintiffs’ deep offense at Defendants’ resolution confer standing here.
In conclusion, Plaintiffs’ allegations are, in all relevant respects, identical to the plaintiffs’ allegations in our recent decisions in Bio Linda and Lefevre and to the plaintiffs’ allegations in Flora. Just as the allegations in those cases were insufficient to confer standing, so too are Plaintiffs’ allegations here.
The majority fails to grapple with our holdings in Bio Linda and Lefevre. In particular, our holding in Lefevre, 598 F.3d at 643, applies with equal force here: “Although [Plaintiffs] allege[ ] the [resolution] turns [Catholics] into political outsiders and inflicts a stigmatic injury upon them, an ‘abstract stigmatic injury’ resulting from such outsider status is insufficient to confer standing.” The majority distinguishes those cases, and all other precedent, only on the ground that this case involves an unambiguous condemnation of a specific religion, while previous ones involved “vague and general religiosity.” Maj. op. at 1050-51 n. 26. As an initial matter, despite the great number of previous decisions involving challenged governmental actions, the majority cites not a single one in which the ambiguity or plainness of the perceived condemnation or endorsement of religion is even mentioned by a reviewing court for purposes of the standing inquiry. I do not, of course, question that Plaintiffs view the resolution as an attack on their religion. Similarly, though, courts in previous cases have not questioned that the plaintiffs viewed the challenged governmental action as an attack on, or an endorsement of, a specific religion. Whether the members of the reviewing court perceive the alleged attack or endorsement as “plain” or “ambiguous” seems fraught with difficulty. And, in many of the cases I have cited, I see no ambiguity. For example, the statute declaring our motto as “In God We Trust” is an unambiguous endorsement of theistic religions at the expense of the beliefs of atheists. Similarly, the placement of a cross on a city’s seal is an unambiguous endorsement of Christianity at the expense of non-Christian religions. Yet, in Lefevre and Vasquez, and in all our other previous cases, the ambiguity or plainness of the challenged governmental action played no part in the analysis of standing.
Plaintiffs next argue, by way of analogy, that the resolution is similar to a religious display. They contend that, because they have been exposed to the “display,” they have alleged sufficient “contact” with the “display” to constitute an injury in fact. The complaint does not allege the manner in which Plaintiffs encountered the resolution or the form of “display” to which Plaintiffs object, but it appears that Plaintiffs mean that they have read the resolution. That fact does not confer standing.
To begin with, the resolution is not a display; it is an act (albeit a non-binding act) of a legislative body. Had Defendants reproduced the resolution, for example, in giant letters above the entrance to City Hall, Cnty. of Montgomery, 41 F.3d at 1158, or chiseled the resolution into a block of stone eight feet tall and three feet wide in a public park, Green, 568 F.3d at 789- *1079 90, the resolution’s representation in those forms would constitute a religious display. As it is, though, the complaint fails to allege that this resolution has received greater prominence than any other. The resolution was posted, like every other resolution, on Defendants’ website. See http://www.sfbos.org/ftp/uploadedfiles/ bdsupvrs/resolutions06/r0168-06.pdf.
The mere existence of an enactment on the books (or virtual books) is not enough. In the religious display context, a plaintiff has standing when he or she encounters the display with some level of frequency or regularity during the course of the plaintiffs typical routine. It is that “direct and unwelcome contact” with the display that confers standing on the plaintiff. Here, Plaintiffs read the resolution. But apart from that initial contact, Plaintiffs allege no facts to suggest that they ever would have reason to read the resolution again, as part of their regular routine or otherwise (except to facilitate this litigation). In summary, even if I construed the resolution as a religious display, which it is not, Plaintiffs could not meet the “direct and unwelcome contact” requirement that courts consistently have applied in religious display cases.
In this regard, our recent decision in Caldwell, 545 F.3d 1126, is instructive. There, the plaintiff objected to a webpage on a government website. Id. at 1128. The plaintiff argued that,
like the plaintiffs in [religious display] cases, she also came into direct contact with a religious symbol on property owned by the government which she finds offensive; and that, just as the inability of plaintiffs in those cases freely to use public land sufficed as injury in fact, so too should it suffice that she is inhibited from freely using a government resource without running into religious symbols and theological statements which offend her.
Id. at 1131. We rejected her argument, because her interest in using the website was no different than anyone else’s: Her interest was “not sufficiently differentiated and direct to confer standing on her.... An interest in informed participation in public discourse is one we hold in common as citizens in a democracy.” Id. at 1133. Judge Fletcher wrote separately “to elaborate more fully why Caldwell lacks standing.” Id. (B. Fletcher, J., concurring). Judge Fletcher held that the plaintiff could not establish an injury in fact because:
Caldwell also does not allege that her contact with the offensive views expressed on the [government] website was “frequent and regular” or “unwelcome.” [Vasquez, 487 F.3d at 1251-52], There is no allegation that Caldwell had any reason to visit the offending web page more than once. Nor did the single offending web page prevent Caldwell from freely using the rest of the [Understanding Evolution] website: the site comprises approximately 840 pages, each of which can be viewed without having first viewed the offending page.
Id. at 1134 (one citation omitted).
The same reasoning — of both the opinion and the concurrence- — -applies here. Plaintiffs’ interest in reading the resolutions of their municipal government is no different than anyone else’s interest and, therefore, “is not sufficiently differentiated and direct to confer standing.” Id. at 1133. Additionally, Plaintiffs here do not allege that their contact with the resolution was anything more than a one-time occurrence, and “[t]here is no allegation that [Plaintiffs] had any reason to visit the offending web page more than once.” Id. at 1134 (B. Fletcher, J., concurring). In sum, Plaintiffs’ allegations do not constitute an injury “other than the psychological consequence presumably produced by observation of conduct with which one dis *1080 agrees.” Valley Forge, 454 U.S. at 485, 102 S.Ct. 752. Plaintiffs therefore lack standing.
Plaintiffs next protest that their allegations constitute more than pure psychological harm, because they also allege that Defendants’ abuse of power has “ehill[ed] their access to the government. As a result of [the] resolution, Plaintiffs ... will curtail their activities to lessen their contact with Defendants, thereby causing further harm.” Plaintiffs refer us to cases in which courts have held that plaintiffs have standing because of an affirmative change in behavior to avoid a particular religious display. See, e.g., Ellis, 990 F.2d at 1523 (holding that the plaintiffs have standing because they allege that they avoid a public park where a cross is located). Plaintiffs argue that, like the plaintiffs in those cases who avoided public lands to avoid a religious display, Plaintiffs here have standing because their access to government has been “chill[ed]” and they “will curtail their activities to lessen their contact with Defendants.” I am unpersuaded.
Plaintiffs’ allegations suffer from lack of specificity. It is unclear, for instance, when Plaintiffs “will” curtail their activities. It also is unclear what contacts Plaintiffs maintain with Defendants and how, if at all, they “will curtail their activities to lessen [that] contact.” These vague allegations are a far cry from the allegations sufficient to confer standing in religious display cases, in which the plaintiff alleges that he or she regularly sees the offending display and explains how his or her normal routine has changed so as to avoid those encounters. See, e.g., City of St. Charles, 794 F.2d at 269 (holding that one plaintiff has standing because “she detours from her accustomed route to avoid the [lighted] cross”); see also Mann v. City of Tucson, 782 F.2d 790, 793 (9th Cir.1986) (per curiam) (“Although we must, in general, accept the facts alleged in the complaint as true, wholly vague and conelusory allegations are not sufficient to withstand a motion to dismiss.”); Vasquez, 487 F.3d at 1249 n. 4 (noting that the district court disregarded an allegation that the plaintiff had “altered his behavior,” but declining to decide the issue because other allegations sufficed to confer standing (brackets omitted)). Moreover, if Plaintiffs’ vague allegations of some unspecified avoidance of governmental entities were sufficient to confer standing to challenge a proclamation of that governmental entity, then any plaintiff residing within the boundaries of the governmental body could satisfy the “injury in fact” requirement simply by alleging, in general, a threatened curtailment of activities with the governmental entity. No court has accepted such a sweeping proposition. Cf. Laird v. Tatum, 408 U.S. 1, 13-14, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972) (“Allegations of a subjective ‘chill’ are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm; the federal courts established pursuant to Article III of the Constitution do not render advisory opinions.” (internal quotation marks omitted)).
Plaintiffs also point to the primary reason for the standing doctrine: “ ‘The essence of the standing inquiry is whether the [plaintiffs] have alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.’ ” Larson, 456 U.S. at 238-39, 102 S.Ct. 1673 (emphasis added) (quoting Duke Power, 438 U.S. at 72, 98 S.Ct. 2620). Plaintiffs con tend that their deep opposition to the resolution is patent and genuine and that their determined adverseness to the resolution satisfies the basic purpose of the standing doctrine: They are fervent advocates who provide a sharp presentation of the issues.
*1081 I do not question the commitment of Plaintiffs to this case or the skill with which they have presented, and undoubtedly would continue to present, the issues. But the Supreme Court expressly has rejected passion as a substitute for Article III standing. “[Standing is not measured by the intensity of the litigant’s interest or the fervor of his advocacy. ‘[T]hat concrete adverseness which sharpens the presentation of issues,’ Baker v. Carr, 369 U.S. [186,] 204 [82 S.Ct. 691, 7 L.Ed.2d 663 (1962) ], is the anticipated consequence of proceedings commenced by one who has been injured in fact; it is not a permissible substitute for the showing of injury itself.” Valley Forge, 454 U.S. at 486, 102 S.Ct. 752; see also Smelt, 447 F.3d at 685 (“Motivation alone is not enough [to satisfy standing requirements].”).
Plaintiffs also suggest that they must have standing to challenge the resolution because, if they do not have standing, no one would have standing, and that result cannot be correct. I disagree with Plaintiffs’ major premise and their minor premise. It is a bedrock principle that the federal courts are courts of limited jurisdiction. A wide variety of doctrines, including standing, prevent us from hearing cases — even otherwise meritorious cases— because of the constitutional limits on our authority. As a general matter, I simply cannot accept an argument that begins with the premise that the federal courts must have jurisdiction over a dispute. More specifically, the Supreme Court has roundly rejected Plaintiffs’ argument in this very context: “ ‘The assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing.’ ” Valley Forge, 454 U.S. at 489, 102 S.Ct. 752 (alteration omitted) (quoting Schlesinger v. Reservists Comm, to Stop the War, 418 U.S. 208, 227, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974)).
Perhaps most importantly, however, Plaintiffs are wrong to suggest that, if they lack standing, then it is clear that no one would have standing to challenge the resolution at issue. To the contrary, it is likely that the parties who are personally the subjects of the resolution, such as Cardinal Levada, Archbishop Niederauer, and Catholic Charities, could demonstrate cognizable harm. The record is silent as to why those parties have not joined as plaintiffs. But their interests, which likely are directly affected, matter. “The Art. Ill aspect of standing ... reflects a due regard for the autonomy of those persons likely to be most directly affected by a judicial order.” Valley Forge, 454 U.S. at 473, 102 S.Ct. 752; see also id. at 489-90, 102 S.Ct. 752 (holding that the Court was “unwilling to countenance” a theory whereby “[t]he existence of injured parties who might not wish to bring suit becomes irrelevant”). For Plaintiffs, however, the resolution carries no legal or direct, particularized, concrete, or practical effect. Accordingly, Plaintiffs cannot establish “injury in fact.”[10]
*1082 Plaintiffs lack standing because no individual Plaintiff can establish “injury in fact.” For that reason and because the complaint fails to allege that any party directly targeted by the resolution is a member of Catholic League, Catholic League likewise lacks associational standing. See Hunt v. Wash. State Apple Adver. Comm’n, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) (holding that, to establish associational standing, an organization must, among other things, demonstrate that its members would otherwise have standing to sue in their own right).
C. Municipal Taxpayer Standing
Plaintiffs also allege that they are municipal taxpayers of San Francisco and that they “have been injured by the abuse of government authority and the misuse of the instruments of government to criticize, demean, and attack their religion and religious beliefs.” [11] Plaintiffs do not allege any specific expenditure of public funds, and none is apparent from the record. That being so, Plaintiffs cannot establish taxpayer standing. See Doremus, 342 U.S. at 433, 72 S.Ct. 394 (holding that municipal taxpayers do not have standing because “[t]here is no allegation that this [government-sponsored] activity is supported by any separate tax or paid for from any particular appropriation or that it adds any sum whatever to the cost of conducting the school”); id. at 434, 72 S.Ct. 394 (“It is apparent that the grievance which it is sought to litigate here is not a direct dollars-and-cents injury but is a religious difference.”); Barnes-Wallace, 530 F.3d at 786 (holding that “municipal taxpayers must show an expenditure of public funds to have standing” (citing Madison, 177 F.3d at 793-97)).
CONCLUSION
I recognize that the failure to reach an important, disputed constitutional issue leaves something to be desired. But I cannot ignore the constitutional bounds of our jurisdiction: “Article III, which is every bit as important in its circumscription of the judicial power of the United States as in its granting of that power, is not merely a troublesome hurdle to be overcome if possible so as to reach the ‘merits’ of a lawsuit which a party [or, as the ease may be, both parties] desires to have adjudicated. ...” Valley Forge, 454 U.S. at 476, 102 S.Ct. 752. We lack subject matter jurisdiction. I therefore concur in the judgment affirming the district court’s order dismissing the complaint.

. For those reasons, it is incorrect to state that Defendants have "conceded standing.” Maj. op. at 1048. As the majority elsewhere recognizes, a party may not “concede” that we have subject matter jurisdiction. (A majority of the en banc panel has voted for Judge Kleinfeld's opinion with respect to standing but not with respect to other Parts. Because I cite only those Parts of Judge Kleinfeld's opinion that command a majority, I refer to his opinion throughout as the majority opinion.)

. We have rejected the proposition that the plaintiffs in Valley Forge lacked standing because their offense was grounded in ideological, rather than religious, beliefs. Buono v. Norton, 371 F.3d 543, 547 (9th Cir.2004), on appeal after remand, 527 F.3d 758 (9th Cir. 2008), rev’d and remanded on other grounds, - U.S. -, 130 S.Ct. 1803, 176 L.Ed.2d 634 (2010). We held that, in Valley Forge, the Supreme Court "drew a distinction between abstract grievances and personal injuries, not ideological and religious beliefs." Id. Significantly, all cases interpreting Valley Forge, discussed infra, have rejected the proposition that abstract harm to religious beliefs alone is sufficient to confer standing.

. I could not agree more that "[standing is emphatically not a doctrine for shutting the courthouse door to those whose causes we do not like.” Maj. op. at 1049. Indeed, at least some of those who join this opinion might have been inclined to agree that the resolution violates the Establishment Clause, had a proper plaintiff brought this case. Equally important, however, standing is emphatically not a doctrine for opening the courthouse door to everyone who wishes us to resolve their questions of constitutional law — however academically interesting those questions may be.

. In American Family, we did not discuss standing but, rather, asserted jurisdiction over the Establishment Clause issue sub silentio. Sub silentio holdings on jurisdiction occupy an interesting place in our jurisprudence. We cannot ignore such holdings. See E. Enters, v. Apfel, 524 U.S. 498, 522, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) (‘"While we are not bound by previous exercises of jurisdiction in cases in which our power to act was not questioned but was passed sub silentio, neither should we disregard the implications of an exercise of judicial authority assumed to be proper’ in previous cases.” (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 307, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962))). But their import necessarily is difficult to assess because, by definition, there is no reasoning in the opinion that we may apply to the case at hand. In any event, no difficulty is presented here, because the facts of American Family plainly establish that the standing requirements I discuss in text were met in that case (which may explain our silence on the issue). For instance, I take judicial notice of the complaint in American Family. The plaintiffs there alleged the government’s policy statement was directed specifically at the plaintiffs and that the statement prevented the plaintiffs from placing certain television advertisements that they otherwise would have placed. In short, the policy statement applied directly to the plaintiffs.

. In the four cases following the "see also” indicator, I list the cases in which the Supreme Court did not discuss standing but, rather, asserted jurisdiction over the Establishment Clause issue sub silentio. As explained above, supra note 4, sub silentio holdings on jurisdiction can present interesting challenges. But, here, there are no difficulties because the facts of the listed cases plainly establish that the standing requirements I discuss in text were met in those cases (which may explain the Court's silence on the issue of standing).

. In the four cases following the "see also” indicator, I again list the cases in which the Supreme Court did not discuss standing but, rather, asserted jurisdiction over the Establishment Clause issue sub silentio. As explained above, supra note 4, sub silentio holdings on jurisdiction can present interesting challenges. But, here again, as with the cases noted in the preceding footnotes, the facts of the listed cases plainly establish that the standing requirements I discuss in text were met.

. The Seventh Circuit’s position on this point is a bit uncertain. Compare Zielke, 845 F.2d at 1467 (suggesting that an allegation that the plaintiff altered behavior is necessary to establish standing), with Cnty. of Montgomery, 41 F.3d at 1161 (discussing Ziellce and suggesting that its holding was not so broad); see also City of Plaltsmouth, 358 F.3d at 1029 n. 7 ("It appears likely the Seventh Circuit has disowned the ‘altered behavior' test and distinguished this language contained in Zielke.” (citing Cnty. of Montgomery, 41 F.3d at 1160-61)). At most, the Seventh Circuit constitutes a minority of one circuit.

. The majority opinion incorrectly asserts that I conclude that this case does not involve a challenge to a governmental policy or provision. Maj. op. at 1050-51 n.26. To the contrary, Plaintiffs here challenge a resolution enacted by Defendants, and I agree completely with the majority that “an official resolution of the City of San Francisco is indeed a case involving a specific governmental policy.” Id. (internal quotation marks and brackets omitted). In text, I apply, as we must, the clear standing requirements that we and other courts have developed in cases involving challenges to governmental policies. The majority opinion fails even to acknowledge those requirements or, in large degree, even the relevant cases.

. It is easy to overstate this distinction. A person who adheres to a religion other than, for example, Christianity may perceive the government's placement of a cross on a hill as a direct negative attack on that person’s non-Christian religion, rather than as an affirmative endorsement of Christianity. Precisely for this reason, the courts have treated an endorsement and a disapproval as two sides of the same coin in the Establishment Clause context. See, e.g., Lynch, 465 U.S. at 688, 104 S.Ct. 1355 (O'Connor, J., concurring) ("Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community. Disapproval sends the opposite message.”). Similarly, an atheist might view the national motto, “In God We Trust,” as an attack on his or her religious beliefs. But that fact is insufficient to confer standing. *1077 Lefevre, 598 F.3d at 643. I therefore decline to attribute much significance to this distinction for standing purposes.

. Although we need not reach the issue, we note in addition that Plaintiffs almost certainly cannot satisfy the "redressability'' requirement. Lujan, 504 U.S. at 560-61, 112 S.Ct. 2130. The resolution exists; it is on the books; and it is an expression of the policy preferences of San Francisco. This court is powerless to change the opinion of the Board of Supervisors on the subject of same-sex adoptions. Even if we declared the resolution unconstitutional, the only real effect of that declaration on Plaintiffs would be to make Plaintiffs happy. Just as the negative psychological consequence of the government’s action is insufficient to satisfy the "injury in fact” requirement, the positive psychological consequence of the court’s action is likewise insufficient to satisfy the “redressability” requirement. Hints of this aspect of redressability are found within the case law. See, e.g., Ashbrook, 375 F.3d at 489-90 (holding that the plaintiff "has and would continue to come *1082 into direct, unwelcome contact with the [religious] display, the removal of which would, no doubt, prevent further injury to him”); Glassroth, 335 F.3d at 1292-93 ("[A] favorable decision will likely redress [the plaintiffs'] injuries. If [the defendant] is required to remove the [religious display] from the public area of the Judicial Building, the plaintiffs will no longer have to observe it or take actions to avoid going into the building.”); Ouachita Parish, 274 F.3d at 293 (”[I]t is certain that a finding of unconstitutionality would redress the plaintiffs' injury, as it would ... end[ ] the practice of verbal prayer in their schools.”); see also Doremus, 342 U.S. at 433, 72 S.Ct. 394 (holding that the plaintiffs could not maintain suit because the student had graduated from the public school and "no decision we could render now would protect any rights she may once have had”).

. Although Plaintiffs have never argued that they have standing as municipal taxpayers, we must consider our jurisdiction independently of a party's arguments. Because they allege in the complaint that they are taxpayers of San Francisco, I address municipal taxpayer standing.